**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| EDWARD NORTRUP, | |
| Plaintiff, | |
| v. | Case No.: 4:25-CV-328-SDJ |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR SALES, U.S.A., INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC. | **JURY TRIAL DEMANDED** |
| Defendants. | |

**PLAINTIFF EDWARD NORTRUP'S OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ................................................................................................1

II.    BACKGROUND ................................................................................................5

III.   LEGAL STANDARDS ......................................................................................5

IV.    PERSON OF ORDINARY SKILL IN THE ART ..............................................7

V.     DISPUTED CLAIM TERMS IN THE '048 PATENT ......................................8

    A.  "An In-Vehicle Data Receiver Forming a Part of a Vehicle Configured to Receive" / "A Data Receiver Configured to Receive" ............................................................8

        1.  "Data Receiver" Has a Readily Ascertainable Plain and Ordinary Meaning, as Described by Nortrup's Proposed Construction. .................................................8

        2.  "Configured to" Also Has a Readily Ascertainable Plain and Ordinary Meaning, as Described by Nortrup's Proposed Construction. ...........................................10

        3.  Section 112(f) Does Not Apply to the "Data Receiver" Limitations .................12

    B.  "A Current Location of a First Cell Phone, as Determined by the First Cell Phone" / "A Current Location" ...................................................................................14

VI.    DISPUTED CLAIM TERMS IN THE '131 PATENT ......................................18

    A.  "A Computer Mounted to Said Vehicle and Configured to Receive" ......................18

        1.  "Computer" Has a Readily Ascertainable Plain and Ordinary Meaning as Described by Nortrup's Proposed Construction ..................................................18

        2.  Section 112(f) Does Not Apply to "a Computer Mounted to Said Vehicle and Configured to Receive." ......................................................................................20

    B.  "Said Computer Being Configured to Communicate" ..............................................22

    C.  "Said Computer … Configured to Cause … Thereby Causing …" ..........................23

    D.  "Said Cell Phone Interface Being Configured … Thereby Causing …" ...................25

        1.  "Cell Phone Interface" Has a Readily Ascertainable Plain and Ordinary Meaning, as Described by Nortrup's Proposed Construction ...............................26

2.  Section 112(f) Does Not Apply to "Said Cell Phone Interface Being Configured … Thereby Causing … " ....................................................................................27

E.  "A Self-Determined Location of Said Cell Phone" ..................................................29

VII.  CONCLUSION............................................................................................................30

# TABLE OF AUTHORITIES

<u>*Cases*</u>:                                                                                                        <u>PAGE</u>

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)............................................................................6

*Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*,
   No. CV 07-8108, 2012 WL 12877984 (C.D. Cal. June 18, 2012) ..................................12

*Apex Inc. v. Raritan Computer, Inc.*,
   325 F.3d 1364 (Fed. Cir. 2003)....................................................................................3, 28

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012).......................................................................................11

*Broad. Innovation, LLC v. Echostar Commc'ns Corp.*,
   240 F. Supp. 2d 1127 (D. Colo. 2003)...........................................................................10

*CDN Innovations, LLC v. Grande Commc'ns Networks, LLC*,
   No. 4:20-CV-653-SDJ, 2021 WL 3615908 (E.D. Tex. Aug. 13, 2021) ...................*passim*

*Chicago Mercantile Exch., Inc. v. Tech. Rsch. Grp., LLC*,
   721 F. Supp. 2d 785 (N.D. Ill. 2010) ............................................................................19

*Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*,
   382 F. Supp. 3d 586 (E.D. Tex. 2019).....................................................................14, 28-29

*E-Pass Techs., Inc. v. 3 Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003)........................................................................................6

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010)........................................................................................6

*Funai Electric Co., Ltd. v. LSI Corp.*,
   No. 16-CV-01210-BLF, 2017 WL 4776450 (N.D. Cal. Oct. 23, 2017)..........................10

*GE Lighting Solutions, LLC v. AgiLight, Inc.,*
   750 F.3d 1304 (Fed. Cir. 2014)....................................................................................6, 15

*Genband USA LLC v. Metaswitch Networks Ltd.*,
   No. 2:14-CV-33-JRG, 2015 WL 4722185 (E.D. Tex. Aug. 7, 2015).............................28

*Huawei Techs. Co. v. T-Mobile US, Inc.*,
   No. 2:16-CV-56-JRG, 2017 WL 2267304 (E.D. Tex. May 24, 2017) .........................2, 3, 12

*Inhale, Inc. v. Gravitron, LLC*,
   No. 1:18-CV-762, 2022 WL 2761380 (W.D. Tex. Mar. 11, 2022) ................................17

*Intell. Ventures II LLC v. BITCO Gen. Ins. Corp.*,
   No. 6:15-CV-59, 2016 WL 125594 (E.D. Tex. Jan. 11, 2016) ........................................28

*Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*,
   649 F.3d 1350 (Fed. Cir. 2011).................................................................................20, 21

*ITT Mfg. Enters., LLC v. Cellco P'ship*,
   No. 1:09-CV-190-LPS, 2011 WL 7121453 (D. Del. Dec. 29, 2011) ..............................10

*Massachusetts Inst. of Tech. v. Shire Pharms., Inc.*,
   839 F.3d 1111 (Fed. Cir. 2016).......................................................................................15

*Mobile Telecommunications Techs., LLC v. Google Inc.*,
   No. 2:16-CV-2, 2016 WL 7338398 (E.D. Tex. Dec. 19, 2016) ......................................12

*Motorola, Inc. v. VTech Commc'ns, Inc.*,
   No. 5:07-CV-171, 2009 WL 2026317 (E.D. Tex. July 6, 2009) .....................................10

*Nevro Corp. v. Boston Sci. Corp.*,
   955 F.3d 35 (Fed. Cir. 2020)...........................................................................................11

*NTP, Inc. v. Rsch. In Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005).......................................................................................17

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008).........................................................................................6

*Omega Eng'g, Inc. v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)...................................................................................3, 12

*Oyster Optics, LLC v. Coriant Am. Inc.*,
   No. 2:16-CV-1302-JRG, 2017 WL 6026729 (E.D. Tex. Dec. 5, 2017),
   *opinion clarified*, No. 2:16-CV-1302-JRG, 2018 WL 3067727
   (E.D. Tex. June 21, 2018)................................................................................................10

*Perdiem Co, LLC v. IndusTrack LLC*,
   No. 2:15-CV-727-JRG, 2016 WL 3633627 (E.D. Tex. July 7, 2016)..............................28

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...................................................................5, 6

*Profectus Tech. LLC v. Huawei Techs. Co.*,
   No. 6:11-CV-474, 2014 WL 1575719 (E.D. Tex. Apr. 17, 2014),

iv

*aff'd*, 823 F.3d 1375 (Fed. Cir. 2016) ............................................................................3, 12

*Purdue Pharma L.P. v. Endo Pharm., Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006)....................................................................................6

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
    948 F.3d 1342 (Fed. Cir. 2020)........................................................................2, 20, 21

*SciCoTech GmbH v. Bos. Sci. Corp.*,
    No. 9:07-CV-76, 2008 WL 4148246 (E.D. Tex. Aug. 29, 2008) ...................................17

*SIPCO, LLC v. ABB, Inc.*,
    No. 6:11-CV-48, 2012 WL 3112302 (E.D. Tex. July 30, 2012) .....................................11

*Skky, Inc. v. MindGeek, s.a.r.l.*,
    859 F.3d 1014 (Fed. Cir. 2017).................................................................................7, 13

*Stellar, LLC v. Motorola Sols., Inc.*,
    No. 4:23-CV-750-SDJ, D.I. 169 (E.D. Tex. Apr. 21, 2025)............................................*passim*

*SQWIN SA v. Walmart Inc.*,
    No. 4:22-CV-1040-SDJ, 2023 WL 8532385 (E.D. Tex. Dec. 8, 2023) ........................1, 4, 14, 15

*Superguide Corp. v. DirecTV Enters.*,
    358 F.3d 870 (Fed. Cir. 2004)......................................................................................6

*TecSec, Inc. v. Int'l Bus. Machs. Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013)....................................................................................7

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)....................................................................................5

*Trading Techs. Int'l., Inc. v. eSpeed, Inc.*,
    595 F.3d 1340 (Fed. Cir. 2010)....................................................................................6

*U.S. v. Rankin*,
    No. 23-CR-24, 2025 WL 1456498 (E.D.N.Y. May 21, 2025) ........................................19

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)....................................................................................20

*Zeroclick, LLC v. Apple Inc.*,
    891 F.3d 1003 (Fed. Cir. 2018)....................................................................................7

**<u>*Statutes:*</u>**

18 U.S.C. § 1030(e)(1)..................................................................................................19

35 U.S.C. § 112(f) ...............................................................................................*passim*

## I.    INTRODUCTION

For the reasons shown herein, the Court should give the disputed claim terms in question their plain and ordinary meanings, consistent with Nortrup's proposed constructions and those of his expert, Dr. Bayen. Nothing in the intrinsic record remotely supports Toyota's effort to depart from the settled plain meanings of these terms. Rather, Toyota's constructions are results-driven, far-fetched attempts to narrow and invalidate, not principled applications of claim-construction law. The Court has seen this type of results-driven argumentation before. In fact, it has repeatedly rejected it in recent *Markman* orders: *Stellar, LLC v. Motorola Sols., Inc.*, No. 4:23-CV-750-SDJ, D.I. 169 (E.D. Tex. Apr. 21, 2025); *SQWIN SA v. Walmart Inc.*, No. 4:22-CV-1040-SDJ, 2023 WL 8532385 (E.D. Tex. Dec. 8, 2023); *CDN Innovations, LLC v. Grande Commc'ns Networks, LLC*, No. 4:20-CV-653-SDJ, 2021 WL 3615908 (E.D. Tex. Aug. 13, 2021). Here, Toyota employs virtually the same losing playbook—pressing strained prosecution-disclaimer theories, trying to graft negative limitations into otherwise straightforward claim language, and shoehorning patent indefiniteness assertions into claim construction using an overly-expansive interpretation of § 112(f) "means-plus-function" law. Toyota does this despite the settled law that disclaimer and lexicography are "exacting" exceptions to ordinary meaning, and despite the equally settled norm that terms such as "receiver," "computer," and "interface" —the terms in dispute in this case—are common structural engineering terms.

Contrary to Toyota's untenable positions, the disputed terms in fact require no construction beyond plain meaning because their meaning is clear to a person of ordinary skill and readily understandable to a jury. Where the Court elects to construe, Nortrup proposes limited clarifications that track how engineers and courts understand these terms. Toyota's competing proposals, by contrast, seek to: (1) recast ordinary structural components as § 112(f) limitations and then baldly assert they are fatally indefinite for lack of "structure," often invoking

1

lack of any "algorithm;" and (2) import negative limitations based on alleged disclaimers which are neither "clear" nor "unmistakable" within the meaning of the applicable case law.

First, Toyota's § 112(f) positions ignore how courts, and this Court in particular, treat the kinds of terms at issue here. U.S. Patent No. 11,307,048 ("the '048 patent") (Ex. 1) uses "data receiver" in the normal engineering sense: a device or component that receives data or signals from some other device or component, which would include standard hardware like an antenna or port and supporting circuitry. The claim language reinforces that structural meaning by expressly situating the receiver as part of an "in-vehicle computer system" and by reciting wired and wireless dependent claims. Nortrup's expert Dr. Bayen explains that a POSA (a "person of ordinary skill in the art") would immediately recognize "receiver" as a known class of structures, and courts in this district have treated the term the same way. *See, e.g.*, *Huawei Techs. Co. v. T-Mobile US, Inc.*, No. 2:16-CV-56-JRG, 2017 WL 2267304, at *14 (E.D. Tex. May 24, 2017) (finding "receiver" structural; rejecting argument that it was part of a means-plus-function limitation). Toyota's attempt to label "data receiver" a structureless nonce word—a merely amorphous "means" —is precisely the sort of strained recharacterization that courts reject.

The same is true for the U.S. Patent No. 11,874,131 ("the '131 patent") (Ex. 2) "computer" and "cell phone interface" limitations. A "computer mounted to said vehicle" is not an abstraction or a nonce term; it is a concrete, vehicle-integrated computer that a POSA would understand as processor-based structure. Federal Circuit precedent confirms that this kind of terminology is essentially structural. *See, e.g.*, *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1353-55 (Fed. Cir. 2020) (finding "digital processing unit" structural). "Cell phone interface" likewise denotes the hardware-based connection by which a computer communicates with a phone—again, as confirmed by the Federal Circuit to connote structure.

2

*See, e.g.*, *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1374 (Fed. Cir. 2003) (finding "interface circuit" structural). Toyota's response is not to grapple with what a POSA would understand from the claim language and context, but to insist that unless the patent spells out additional details that are essentially characteristics of the preferred embodiment, the term must be treated as a strictly functional "means." This Court recently rejected that same assertion in *Stellar*, holding that similar computing-hardware language—including "computer processor configured to" and "hardware that executes an instruction set"—did *not* invoke § 112(f) because a POSA would understand the claim language to refer to a known class of computer/processor structures. *Stellar* at 26-27, 29. Applying *Stellar*, Toyota's position that the foregoing claim terms are fatally indefinite means-plus-function terms should be completely rejected.

Second, Toyota's disclaimer theory fares no better. For the '048 patent's "current location … as determined by the first cell phone" limitation (and Toyota's attempt to apply the same narrowing argument across other location-related terms), Toyota seeks to import a negative limitation[1]: "without use of an in-vehicle integrated navigation system." But, as shown herein, prosecution disclaimer requires a clear and unmistakable surrender of claim scope, and ambiguity defeats disclaimer. Here, the prosecution history does not contain the sort of unmistakable disavowal that Toyota must show for its proffered interpretations to be adopted by the Court. Nor does the specification support Toyota's attempted rewriting of the claims; it contemplates systems in which vehicles and phones may each have locating facilities and

---

[1] A "negative limitation" is a claim limitation that explicitly carves out certain subject matter from the claim scope rather than affirmatively describing the claimed invention. "Absent a specific disavowal, negative limitations are generally disfavored." *Profectus Tech. LLC v. Huawei Techs. Co.*, No. 6:11-CV-474, 2014 WL 1575719, at *8 (E.D. Tex. Apr. 17, 2014), *aff'd*, 823 F.3d 1375 (Fed. Cir. 2016) (citing *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003)).

communicate with each other, and it never purports to exclude vehicles with integrated navigation capability from presenting information to the phone. Toyota's proposed negative limitation is thus a baseless attempt to narrowly edit the claim language.

Third, Toyota's construction of "configured to" should be rejected. If adopted, it would only create confusion rather than clarify the claim language for the jury. The parties agree that the term requires a device to be set up or programmed to perform the stated function, but Toyota then seeks to append a vague negative formulation ("*not* merely capable of") that invites jury confusion and is not supported by plain meaning or by the intrinsic evidence. On the other hand, Nortrup's construction of "configured to" avoids these problems by stating the operative requirement affirmatively and in the same manner as courts regularly do.

In short, the intrinsic record and the governing law point in the same direction. The asserted claims recite structural components (e.g., receivers, computers, interfaces) operating in a familiar communication and computing architecture. The claims themselves add further structural context (e.g., "mounted to said vehicle," "forming a part of a vehicle," "interface integrated into said vehicle"), and the specification uses the disputed terms consistently with their plain meaning. There is also no lexicography and no clear and unmistakable disclaimer that would justify Toyota's effort to narrow the claims in question. In short, the Court should reject any effort to import negative limitations into these claims or to invalidate them by applying a strained and overbroad reading of § 112(f) means-plus-function law to familiar structural terms.

Nortrup therefore asks the Court to resolve these disputes the same way it has in *Stellar*, *SQWIN*, and *CDN*: reject the accused infringer's results-driven constructions; reject artificialities seeking to narrow or invalidate claims by rewriting the claims; apply plain and ordinary meaning where appropriate, and, where the Court determines further construction will aid the jury, adopt

4

Nortrup's proposed constructions as discussed herein.

## II.    BACKGROUND

The asserted patents are directed to in-vehicle navigation architectures in which a user's cell phone performs the core navigation and routing functions, while a vehicle-mounted computer provides a user interface for presenting map data and receiving user inputs—an architecture exemplified today by the use of in-vehicle Apple CarPlay and Android Auto systems. Further background discussion will be provided in the separately filed technology tutorial and is provided in Dr. Bayen's expert declaration. (Bayen Decl. (Ex. 3) ¶¶ 32-38.)

## III.    LEGAL STANDARDS

It is black-letter law that the claims define the scope of a patent. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*). Claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention unless there is clear evidence in the patent's specification or prosecution history that the patentee intended a different meaning. *Id*. at 1312-13. Claim construction is also informed by the intrinsic evidence, including the patent's specification and prosecution history. *Id.* at 1315-17. Moreover, "[q]uite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. "[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *Id.* at 1314.

When consulting the specification for the purpose of construing claims, courts should "avoid the danger of reading limitations from the specification into the claim." *Id.* at 1323. "[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." *Id.* Limitations in a specification should only be read into claims if the patentee was "his own

lexicographer and imbued the claim terms with a particular meaning or disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction." *E-Pass Techs., Inc. v. 3 Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). The standards for finding lexicography and disavowal are "exacting." *GE Lighting Solutions, LLC v. AgiLight, Inc.,* 750 F.3d 1304, 1309 (Fed. Cir. 2014).

"Although [it] is correct that the prosecution history is always relevant to claim construction, it is also true that the prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage." *Superguide Corp. v. DirecTV Enters.*, 358 F.3d 870, 875 (Fed. Cir. 2004); *Purdue Pharma L.P. v. Endo Pharm., Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). To be effective, such a disclaimer must be "unmistakable." *Trading Techs. Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010).

Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. Extrinsic evidence "can shed useful light on the relevant art," and, by extension, the plain and ordinary meanings of claim terms. *Id.*

District courts also are not "required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). In particular, the Court may properly resolve the parties' dispute simply by rejecting improper, unnecessary, or unhelpful proposed constructions. *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1325-26 (Fed. Cir. 2012); *see also Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010).

Title 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) provides: "An element in a claim for a

combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." The Federal Circuit has long held that the absence of the word "means" in a claim creates a rebuttable presumption against the application of § 112, ¶ 6. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) ("To determine whether § 112, para. 6 applies to a claim limitation, our precedent has long recognized the importance of the presence or absence of the word 'means.' The failure to use the word "means" creates a rebuttable presumption that § 112, ¶ 6 does not apply.") (internal quotations and citation omitted). "To determine whether a claim recites sufficient structure, 'it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.'" *Skky, Inc. v. MindGeek, s.a.r.l.*, 859 F.3d 1014, 1019 (Fed. Cir. 2017) (quoting *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1347 (Fed. Cir. 2013)).

## IV.    PERSON OF ORDINARY SKILL IN THE ART

At the time of the invention, a POSA for purposes of the asserted patents would have had at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a closely related field, and at least two years of experience with (i) location-based services (e.g., GPS, cellular triangulation), (ii) cellular devices, (iii) in-vehicle computing/infotainment systems, and/or (iv) digital map data and navigation/route guidance systems. (Bayen Decl. (Ex. 3) ¶¶ 29-31.) Additional practical experience may substitute for some education, and additional education may substitute for some experience. (*Id.*) This POSA definition substantively aligns with the definition provided by Toyota's expert Dr. Shoemake. (Shoemake Decl. (Ex. 4) ¶ 35.)

## V.    DISPUTED CLAIM TERMS IN THE '048 PATENT

### A.    "An In-Vehicle Data Receiver Forming a Part of a Vehicle Configured to Receive" / "A Data Receiver Configured to Receive"

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "an in-vehicle data receiver forming a part of a vehicle configured to receive…" ('048 patent, claims 1, 13, 15)<br><br>"a data receiver configured to receive …" ('048 patent, claim 17) | plain and ordinary meaning<br><br>"data receiver": plain and ordinary meaning, i.e., a device or component that receives data or signals, for example in the form of electromagnetic radiation or electrical impulses, from one or more other devices or components<br><br>"configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | means plus function<br><br>• function: receive a roadway map of an area proximate a current location of a first cell phone, as determined by the first cell phone, and a route from the current location to a destination based, at least in part, on an estimated roadway traffic condition<br>• structure: none; indefinite<br><br>"configured to": designed/arranged/programmed to; not merely capable of |

### 1.    "Data Receiver" Has a Readily Ascertainable Plain and Ordinary Meaning, as Described by Nortrup's Proposed Construction.

Nortrup's claim construction expert Dr. Bayen, and the sources he relies on, confirm the ordinary engineering meaning of "receiver" as a device or component that receives data or signals (or signals containing data), for example in the form of radiation or electrical impulses, from one or more other devices or components. (Bayen Decl. (Ex. 3) ¶¶  47-48.) That device or component can also potentially perform other functions such as decoding or translating the incoming data/signal. (*Id.*) For example, a technical definition produced by Toyota describes a receiver as "a circuit that accepts signals from a transmission medium" and then "decodes or translates" those signals into a form that can drive local circuits. (*Id.* at ¶ 48 (citing *What Is a Receiver?*, ANALOG DEVICES (Ex. 6) TOYOTA_378939)).) Likewise, Toyota's cited Britannica passage explains that receivers accept selected signals and convert them into usable forms (often

with amplification and processing). (*Id.* at ¶ 48 (citing *Receiver*, BRITANNICA (Ex. 6)

TOYOTA_378938); *see also Intro to Electrical Engineering Key Term – Receiver*, FIVEABLE

(Ex. 5) Plaintiff_011266) ("A receiver is a device or component in a communication system that

captures and decodes signals sent over a medium, such as radio waves, optical fibers, or

cables."); *Receiver*, COLLINS ENGLISH DICTIONARY (Ex. 5) Plaintiff_011303) ("A receiver is a

circuit that accepts signals from a transmission medium and decodes or translates them into a

form that can drive local circuits.").) Consistent with those definitions, Dr. Bayen explains that a

POSA would understand "data receiver" in its ordinary sense as a device or component that

receives incoming signals/data from another device/component. (Bayen Decl. (Ex. 3) ¶¶ 47-48.)

The intrinsic record uses "data receiver" in a manner consistent with that ordinary

meaning. The claims recite an "in-vehicle data receiver forming a part of a vehicle" and "a data

receiver configured to receive" within an "in-vehicle computer system." (Bayen Decl. (Ex. 3) ¶

49; '048 patent, claims 1, 13, 15, 17.) A POSA would naturally understand that the "data

receiver" in this context encompasses known receiver components used in electronic systems to

receive data—such as receivers associated with wired interfaces (e.g., USB) and/or wireless

interfaces (e.g., Bluetooth, Wi-Fi). (Bayen Decl. (Ex. 3) ¶ 49.) In fact, claims 3 and 4 of the '048

patent confirm that "data receiver" is used in its ordinary sense, as these claims specify the type

of connection (wired or wireless) used by the receiver. (*Id.*) The specification similarly describes

communications / navigation architectures in which data is exchanged among mobile devices, in-

vehicle systems, and networks through wired or wireless communications, which again refers to

known classes of components and functionality. (Bayen Decl. (Ex. 3) ¶¶ 50, 57; '048 patent,

14:15–20, 16:57–59, 20:16–47, 24:28–32, 37:39–55, Fig. 35.)

Courts consistently treat "receiver" terminology as having a readily ascertainable

ordinary meaning that aligns with Nortrup's proposed construction. For example, in *Funai Electric Co., Ltd. v. LSI Corp.*, the court adopted a plain-meaning construction of "channel receiver" as "a digital data receiver that receives data from a channel." No. 16-CV-01210-BLF, 2017 WL 4776450, at *9 (N.D. Cal. Oct. 23, 2017). In *Motorola, Inc. v. VTech Commc'ns, Inc.*, a case relating to cellular communications specifically, "the [c]ourt construe[d] the claim term 'communication receiver' to mean: '[a] device that obtains and demodulates radio signals.'" No. 5:07-CV-171, 2009 WL 2026317, at *18 (E.D. Tex. July 6, 2009). And in *Broad. Innovation, LLC v. Echostar Commc'ns Corp.*, a case "relating to broadcasting data to a television set," the court "construe[d] the term 'receiver' to have its ordinary and accustomed meaning as an apparatus for receiving television broadcasts." 240 F. Supp. 2d 1127, 1131, 1153 (D. Colo. 2003). In each of these cases, the term "receiver" was recognized as a well-known structure for receiving data or signals. Other cases find that "receiver" is sufficiently clear on its own and does not require any construction. *See, e.g.*, *Oyster Optics, LLC v. Coriant Am. Inc.*, No. 2:16-CV-1302-JRG, 2017 WL 6026729, at *17 (E.D. Tex. Dec. 5, 2017), *opinion clarified*, No. 2:16-CV-1302-JRG, 2018 WL 3067727 (E.D. Tex. June 21, 2018) ("[T]he term 'receiver' does not itself require construction . . . ."); *ITT Mfg. Enters., LLC v. Cellco P'ship*, No. 1:09-CV-190-LPS, 2011 WL 7121453, at *25 (D. Del. Dec. 29, 2011) ("[T]he Court will construe 'GPS Receiver' . . . to mean 'a receiver that calculates its position using signals from GPS satellites.'").

As such, "data receiver" requires no construction, but if the Court decides to construe the term, it should construe it according to Nortrup's plain and ordinary meaning proposal.

### 2. "Configured to" Also Has a Readily Ascertainable Plain and Ordinary Meaning, as Described by Nortrup's Proposed Construction.

Courts—including the Federal Circuit—consistently recognize that "configured to" (and synonymous formulations such as "adapted to") has a readily ascertainable meaning in apparatus

claims: the claimed device must be set up (i.e., designed, arranged, programmed, etc.) to perform the recited function, not merely capable of being modified to do so. *See Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 41–42 (Fed. Cir. 2020) (affirming construction of "configured to" in the electronics context as "programmed to"); *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 (Fed. Cir. 2012) (explaining that "adapted to"—frequently treated as synonymous with "configured to"—is "most naturally understood to mean that [claimed structures] are designed or configured to accomplish the specified objective, not simply that they can be made to serve that purpose."); *SIPCO, LLC v. ABB, Inc.*, No. 6:11-CV-48, 2012 WL 3112302, at *11 (E.D. Tex. July 30, 2012).

Dr. Bayen's opinions and supporting sources confirm the same ordinary meaning. Dr. Bayen explains that a POSA would understand "configured to" in its conventional engineering sense: arranged / set up and, where appropriate, programmed such that the device can perform the recited function in ordinary usage, without substantial modification necessary to add the function. (Bayen Decl. (Ex. 3) ¶¶ 43–46 (citing *Configure*, CAMBRIDGE DICTIONARY (Ex. 5) Plaintiff_010833), *Configure*, COLLINS ENGLISH DICTIONARY (Ex. 5) Plaintiff_010842), *Configure*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (2004) (Ex. 6) TOYOTA_378936)).)

Accordingly, if the Court elects to construe "configured to," it should adopt Nortrup's proposed construction because it captures—cleanly and affirmatively—the same settled meaning reflected in the case law and in Dr. Bayen's testimony, without introducing unnecessary confusion. Toyota's construction largely agrees on substance, but adds a negative limitation ("not merely capable of") that is vague without further explanation (i.e., without a construction of "capable of") and risks confusing the jury. *CDN Innovations*, 2021 WL 3615908, at *19

11

(rejecting construction that "injects confusion by introducing vague terms"). Such negative limitations are disfavored. *Profectus*, 2014 WL 1575719, at *8 (citing *Omega Eng'g*, 334 F.3d at 1322). Moreover, none of Toyota's citations to the intrinsic evidence rise to the level of a clear disavowal of claim scope. Nortrup's construction avoids that problem by stating the operative requirement directly and clearly.

### 3. Section 112(f) Does Not Apply to the "Data Receiver" Limitations.

Courts, including in this District, routinely recognize "receiver"-related terms as names for structure and reject attempts to treat them as nonce "black boxes." In *Huawei*, defendants argued that "receiver" and "transmitter" were nonce words and that the patent was indefinite for lack of an algorithm. 2017 WL 2267304, at *8. The court rejected that theory, holding that "receiver" and "transmitter" were "not nonce words." *Id.* at *14. Likewise, in *Mobile Telecommunications Techs., LLC v. Google Inc.*, the court held that "'receiver' and 'transmitter' are not 'nonce' terms [] but rather connote classes of structures," and it construed the "receiver"/"transmitter" limitations according to their plain meaning. No. 2:16-CV-2, 2016 WL 7338398, at *42–43 (E.D. Tex. Dec. 19, 2016). In fact, even where a claim recited "receiver means," a court *still* found that term to recite sufficient structure to overcome means-plus-function treatment. *Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, No. CV 07-8108, 2012 WL 12877984, at *4 (C.D. Cal. June 18, 2012). This settled law fits the engineering reality. Dr. Bayen explains that a POSA would understand "data receiver" in its ordinary sense as a known class of physical structures—a device or component that receives incoming signals or data from another device or component. (Bayen Decl. (Ex. 3) ¶ 53-58; *see supra*.)

The intrinsic record likewise treats the "data receiver" as a concrete in-vehicle component, not an abstract or functional nonce. The claims recite "an in-vehicle data receiver forming a part of a vehicle" within an "in-vehicle computer system," and dependent claims

specify that the receiver communicates via wired or wireless connections—confirming that "data receiver" is used in its ordinary structural sense. (Bayen Decl. (Ex. 3) ¶ 57; '048 patent, claims 1, 3, 4, 13, 15, 17.) The specification similarly describes computer/phone/network architectures that incorporate known receiving hardware on the vehicle side. (Bayen Decl. (Ex. 3) ¶ 57 (citing '048 patent, 14:15–20, 16:57–59, 20:16–47, 24:28–32, 37:39–55, Fig. 35).)

Toyota's expert Dr. Shoemake reaches the opposite conclusion only by assuming away the structural import of "receiver" without support. Shoemake asserts that the "data receiver" limitations "refer only to the various functions performed by the 'data receiver'" and therefore do not connote structure. (Shoemake Decl. (Ex. 4) ¶ 38.) But describing/naming a structural component by what it is configured to do is routine in engineering and does not erase structure. (Bayen Decl. (Ex. 3) ¶ 48 (comparing "receiver" to other functionally named structural terms like "transmitter," "encoder," "decoder," "processor").) Indeed, as the Federal Circuit has explicitly noted, "[t]o determine whether a claim recites sufficient structure, 'it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and *even if the term identifies the structures by their function*.'" *Skky*, 859 F.3d at 1019 (emphasis added). Accordingly, the mere fact that the word "receiver" refers to receiving does not suggest that POSAs do not associate the word with a class of structures used to perform that function. That is why courts have repeatedly found "receiver" terms to be structural and not means-plus-function.

Moreover, Shoemake's argument that the receiver terms or specification do not convey "an algorithm or data-handling process" (Shoemake Decl. (Ex. 4) ¶ 41) improperly conflates the two steps of the means-plus-function analysis. As this Court recognized in *CDN*, the search for an algorithm "is triggered only when the limitation is a means-plus-function limitation." 2021

13

WL 3615908, at *13. Like the defendant in *CDN*, Shoemake "has conflated the steps in the § 112 ¶ 6 analysis by simply assuming that the limitation is a means-plus-function limitation." *Id.* Because, as discussed above, the "receiver" terms refer to structure and thus are not governed by § 112 ¶ 6, Shoemake's discussion of algorithms is legally irrelevant.

Nor can Toyota overcome the presumption against means-plus-function treatment by arguing that the claims do not recite a specific explanation of how the claimed "data receiver" functions. This Court rejected that approach in *SQWIN*, stating:

> Walmart further argues (without support) that "payment" does not "import sufficient structure to explain how" the recited functions of the payment system are performed. But that is not the correct standard. Instead, the Court is required to determine whether "payment system" would denote sufficient structure or a class of structures to a POSITA.

2023 WL 8532385, at *11. And the Court has likewise found § 112(f) inapplicable where the claim language identifies a structural component (e.g., "computer processor") even though it is described by what it is configured to do. *Stellar* at 20–21 (quoting *Cypress Lake Software, Inc. v. Samsung Elecs. Am., Inc.*, 382 F. Supp. 3d 586, 665–66 (E.D. Tex. 2019)).

Accordingly, § 112(f) does not apply to the "data receiver" limitations.

**B.    "A Current Location of a First Cell Phone, as Determined by the First Cell Phone" / "A Current Location"**

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "a current location of a first cell phone, as determined by the first cell phone" (claims 1, 17)<br><br>"a current location" (claim 13, 15) | plain and ordinary meaning<br><br>"current location": plain and ordinary meaning, i.e., present location | a present location of a first cell phone, as determined by the first cell phone without use of an in-vehicle integrated navigation system |

Toyota's proposed construction rewrites the claims to add a negative limitation— "without use of an in-vehicle integrated navigation system"—that appears nowhere in the patent.

That is improper. As Dr. Bayen correctly explains, the phrase plainly identifies *which device makes the final claimed location determination*, not what inputs that device may consider in reaching that determination. (Bayen Decl. (Ex. 3) ¶¶ 60–66.)

Toyota's overreach is particularly stark because it seeks to impose the same negative limitation not only on the claims that recite "as determined by the first cell phone" (claims 1, 17), but also on claims that say nothing about what determines the location (claims 13, 15). Toyota thus asks the Court to import a restriction untethered to the actual claim language of claims 13 and 15, effectively rewriting "a current location" to require measuring the location based on both a specified measurement source and an excluded measurement source when the claim language itself does not refer to a measurement source. (Bayen Decl. (Ex. 3) ¶ 61.) That alone is reason to reject Toyota's construction, and it underscores that Toyota's position is not a faithful application of any prosecution-history "disclaimer," but an effort to graft an atextual limitation across different claim formulations.

That kind of claim rewriting is foreclosed by the Federal Circuit's "exacting" disclaimer standard. *GE Lighting Solutions*, 750 F.3d at 1309. Prosecution disclaimer applies only where the patentee's statements amount to a *clear and unmistakable* surrender of claim scope; statements that are "amenable to multiple reasonable interpretations" do not justify importing narrowing limitations. *See Massachusetts Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016). This Court has recently applied those principles to reject efforts to narrow claim scope based on ambiguous prosecution history and to avoid "redraft[ing]" claims absent a true disclaimer. *CDN*, 2021 WL 3615908, at *25. *See also SQWIN*, 2023 WL 8532385, at *14.

The intrinsic record confirms Toyota's negative limitation is baseless. The claim language speaks to *what* determines the phone's location in claims 1 and 17, not whether the

phone may consider information from other subsystems. (Bayen Decl. (Ex. 3) ¶ 63.) The specification repeatedly contemplates navigation and routing being generated based on multiple inputs—including "external data," GPS or other locating facilities, and other sources—without excluding vehicle-originated inputs. (Bayen Decl. (Ex. 3) ¶ 64; '048 patent at 19:16–21, 19:35–39.) The disclosure also expressly contemplates vehicle-side location capability, explaining that a mobile mapping facility in the automobile "may include a GPS or other locating facility," and that "a vehicle, cell phone or other device may be equipped with a GPS locating facility" and "transmit its location to another facility." (Bayen Decl. (Ex. 3) ¶¶ 65–66; '048 patent at 18:65–19:21, 20:16–47.) Toyota's categorical "without use of an in-vehicle integrated navigation system" limitation is irreconcilable with that disclosure.

The prosecution history likewise does not supply the "clear and unmistakable" disclaimer that Toyota needs. In the exchange Toyota relies on, the applicant distinguished prior-art systems that "teach[] the use [of] an in-vehicle integrated GPS system to determine a vehicle's location" and "focus[] on using an in-vehicle integrated navigation system with an integrated GPS system for determination of a current position of the vehicle." (Bayen Decl. (Ex. 3) ¶¶ 67-68; '048 Patent Prosecution, Response to Final Office Action dated Oct. 8, 2021 (Ex. 7) (pp. 292-93).) The applicant emphasized that the particular claims at issue, by contrast, use "a location of a first cell phone, as determined by the first cell phone." (*Id.*) Critically, the same discussion expressly acknowledged the opposite of Toyota's proposed exclusion: the applicant stated that the invention "would operate as intended whether or not the vehicle was equipped with GPS." (*Id.*) As Dr. Bayen explains, that statement reflects optionality and non-dependence—not a strict prohibition on any and all GPS-equipped vehicles, vehicle GPS signals, or the phone's ability to receive and consider vehicle-sourced inputs—so long as the phone ultimately determines its own

location. (Bayen Decl. (Ex. 3) ¶¶ 68–70.) The phone could, for example, consider its own GPS data, the vehicle's GPS data, speedometer data, etc., and then determine its location (which is also the vehicle's location by virtue of the phone being inside the car) by assessing the data collectively.

Toyota's expert Dr. Shoemake attempts to convert those same prosecution remarks into a sweeping exclusion, asserting that "as determined by the first cell phone" means the phone must determine location "alone," "without use" of an in-vehicle navigation system. (Shoemake Decl. (Ex. 4) ¶¶ 49–53, 67–70.) But that reading overreaches. It conflates the straightforward proposition that the phone determines the operative location with an unclaimed requirement that the phone operates in isolation. Such an interpretive leap is not supported—and is actually refuted by—the intrinsic record. (Bayen Decl. (Ex. 3) ¶¶ 63–70.) Moreover, Toyota's argument cannot justify rewriting claims 13 and 15, which do not even recite "as determined by the first cell phone." ('048 patent, claims 13, 15; Bayen Decl. (Ex. 3) ¶¶ 60–61.) *SciCoTech GmbH v. Bos. Sci. Corp.*, No. 9:07-CV-76, 2008 WL 4148246, at *3 (E.D. Tex. Aug. 29, 2008) ("A textual 'hook' in the claim language is required for [a narrowing] limitation to be imposed.") (citing *NTP, Inc. v. Rsch. In Motion, Ltd.*, 418 F.3d 1282, 1310 (Fed. Cir. 2005); *Inhale, Inc. v. Gravitron, LLC*, No. 1:18-CV-762, 2022 WL 2761380, at *6 (W.D. Tex. Mar. 11, 2022).

Accordingly, the Court should reject Toyota's attempt to import a negative limitation into these claims. The plain and ordinary meaning controls: "current location" refers to the phone's present location, and "as determined by the first cell phone" merely identifies that the phone makes the claimed location determination.

## VI.    DISPUTED CLAIM TERMS IN THE '131 PATENT

### A.  "A Computer Mounted to Said Vehicle and Configured to Receive"

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "a computer mounted to said vehicle and configured to receive" (′131 patent, claims 1, 11) | plain and ordinary meaning<br><br>"computer": plain and ordinary meaning, i.e., an electronic device or component with a data processor<br><br>"configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | means plus function<br><br>• function: receive user input comprising at least a command of a destination<br>• structure: none; indefinite<br><br>"configured to": designed/arranged/programmed to; not merely capable of |

### 1.    "Computer" Has a Readily Ascertainable Plain and Ordinary Meaning, as Described by Nortrup's Proposed Construction.

Nortrup's claim construction expert, Dr. Bayen, and the technical sources he relies on, confirm that a POSA would understand "computer" in its ordinary engineering sense as a physical electronic device (or component) whose defining characteristic is the presence of a data processor that performs operations on data, typically with supporting hardware such as memory. (Bayen Decl. (Ex. 3) ¶ 72.) For example, Britannica explains that a computer's "physical elements" (hardware) are generally divided into the central processing unit (CPU), main memory, and peripherals. (*Id.*; *Computer*, BRITANNICA (Ex. 5) Plaintiff_010778).) Likewise, Merriam–Webster defines a computer as "a programmable usually electronic device that can store, retrieve, and process data," which inherently presupposes processor-based data processing. (Bayen Decl. (Ex. 3) ¶ 73; *Computer*, MERRIAM-WEBSTER DICTIONARY (Ex. 5) Plaintiff_010803).) Educational engineering materials reinforce the same concept, describing a computer as an electronic device that "manipulates" information or data—i.e., processes data using a processor. (Bayen Decl. (Ex. 3) ¶ 73; *Computer Basics: What Is a Computer?*, GFCGLOBAL (Ex. 5) Plaintiff_010798).)

That ordinary meaning fits the claim context here. The claims do not use "computer" in an abstract way; they recite "a computer mounted to said vehicle," i.e., a physical device integrated into the vehicle. (Bayen Decl. (Ex. 3) ¶ 75; '131 patent, claims 1, 11.) As Dr. Bayen explains, engineers commonly understand that automobiles contain embedded computing systems (e.g., vehicle infotainment or navigation head units) built around processors and designed to receive and process data inputs. (Bayen Decl. (Ex. 3) ¶ 75.) Britannica's discussion of "embedded processors" is directly consistent with that understanding, explaining that embedded processors are small computers using microprocessors to control electrical and mechanical functions and noting that such processors "are common in automobiles." (Bayen Decl. (Ex. 3) ¶ 74; *Computer*, BRITANNICA (Ex. 5) Plaintiff_010769–84).) The intrinsic record likewise uses "computer" conventionally—as an onboard, processor-based electronic device within an in-vehicle system that receives, processes, and exchanges information. (Bayen Decl. (Ex. 3) ¶¶ 75–76.) Nothing in the claims or written description suggests that "computer" is being used idiosyncratically or has a special definition that departs from its ordinary meaning. (Id.)

In *Stellar*, this Court understood "hardware that executes an instruction set" as referring to a "computer or processor," treated the term as being equivalent to "computer processor," and gave each term its "plain and ordinary meaning." *Stellar*, pp. 27-29. *See also, e.g.*, *Chicago Mercantile Exch., Inc. v. Tech. Rsch. Grp., LLC*, 721 F. Supp. 2d 785, 796 (N.D. Ill. 2010) (finding "computer" had a "readily apparent meaning" and construing it, based on dictionary definitions, as "a programmable electronic device that can store, retrieve, and process data," directly referencing the computer's "process[or]".) *Cf. U.S. v. Rankin*, No. 23-CR-24, 2025 WL 1456498, at *8 (E.D.N.Y. May 21, 2025) ("[C]omputer . . . captures any device that makes use of an electronic data processor.") (referencing the definition of "computer" in 18 U.S.C. §

19

1030(e)(1)). These authorities align with Dr. Bayen's testimony and the cited technical sources: a "computer" is an electronic device best characterized by processor-based data processing.

### 2. Section 112(f) Does Not Apply to "a Computer Mounted to Said Vehicle and Configured to Receive."

Toyota and Dr. Shoemake ask the Court to treat the "computer mounted to said vehicle and configured to receive" limitation as a means-plus-function term with no corresponding structure, rendering the claims indefinite. (Shoemake Decl. (Ex. 4) ¶¶ 54–61.) That position fails for a straightforward reason: the claim language identifies a well-known class of structures—a "computer"—further narrowed by the context that it is "mounted to" the vehicle, and then describes what that structure is configured to do. A POSA would not understand "computer" in this context as a nonce label or functional black box. (Bayen Decl. (Ex. 3) ¶¶ 71–77.)

This conclusion is consistent with Federal Circuit law recognizing that "computer" terminology connotes structure. In *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, for example, the Federal Circuit found that the claimed "computing unit" was structural and referred to a computer with known components such as a processor and memory. *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1359–60 (Fed. Cir. 2011), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). Similarly, in *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, the Federal Circuit held that a "digital processing unit" is a structural term—essentially a stand-in for a computer/CPU—not a nonce term invoking § 112(f). 948 F.3d 1342, 1354 (Fed. Cir. 2020).

Again, *Stellar* is highly persuasive. In *Stellar*, this Court rejected a similar effort to invoke § 112(f) for claim terms centered on computer-related terminology—holding that "computer processor configured to" limitations were not governed by § 112(f) because "processor" connotes a known class of structures, and breadth does not render such a term

structurally devoid. *Stellar*, at 20–27. The Court also held that even the phrase "hardware that executes an instruction set" was not a § 112(f) limitation where a POSA would understand it to refer to a computer processor. *Id.* at 27-29.

Dr. Bayen's testimony confirms what the case law already recognizes: a POSA would immediately understand "computer" to denote a structural device whose defining feature is a processor (with supporting hardware such as memory), not a nonce word. (Bayen Decl. (Ex. 3) ¶¶ 71–77.) Bayen further explains that the claim language adds structural specificity by requiring the computer be "mounted to said vehicle," a context a POSA would understand as referring to embedded automotive computing systems (e.g., infotainment head units): physical devices integrated into the vehicle's electronics architecture. (*Id.* at ¶ 75.) And the specification treats "computer" in exactly that ordinary, structural sense, describing computing systems that process information, interface with displays, and communicate with mobile devices. (*Id.* at ¶ 76.) In short, the claim identifies a concrete structural component in the ordinary engineering meaning of the term, and the "configured to receive" language simply describes how that structural component is set up to operate in the claimed system. (*Id.* at ¶¶ 71–77.)

Shoemake's contrary assertion rests largely on the premise that "computer" is "generic" and therefore must be treated as non-structural unless the claims recite "concrete architecture, circuitry, or algorithm." (Shoemake Decl. (Ex. 4) ¶¶ 54–57.) But that is not the legal test for whether § 112(f) applies to a non-"means" limitation, and it is directly at odds with *Stellar*, *Inventio*, and *Prisua*. Notably, Shoemake's own cited definition identifies a computer as a programmable electronic device that "can store, retrieve, and process data," which is consistent with Bayen's explanation that the processor is the hallmark structure of a computer. (*Compare* Shoemake Decl. (Ex. 4) ¶ 55 *with* Bayen Decl. (Ex. 3) ¶¶ 72–74.) Demanding additional detail is

an attempt to impose means-plus-function requirements where § 112(f) does not apply.

Accordingly, § 112(f) does not apply to the "a computer mounted to said vehicle and configured to receive" limitation, and Toyota's indefiniteness theory necessarily collapses.

**B.    "Said Computer Being Configured to Communicate"**

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "said computer being configured to communicate" ('131 patent, claims 1, 11) | plain and ordinary meaning "computer": plain and ordinary meaning, i.e., an electronic device or component with a data processor "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | means plus function • function: communicate with a cell phone • structure: none; indefinite "configured to": designed/arranged/programmed to; not merely capable of |

As explained above, both "computer" and "configured to" have readily ascertainable plain and ordinary meanings and do not implicate § 112(f). Dr. Bayen confirms that those same meanings apply here, and that the added phrase "configured to communicate" further describes the design and set-up of a processor-based in-vehicle computer, not an abstract, structureless "means." (Bayen Decl. (Ex. 3) ¶¶ 78–81.) Toyota's expert Dr. Shoemake nevertheless asserts that this limitation invokes § 112(f). (Shoemake Decl. (Ex. 4) ¶ 54.) The Court should again reject that attempt to manufacture a means-plus-function issue from ordinary claim language.

Read in context, the claim language simply requires that the in-vehicle computer is set up to exchange information with the recited cell phone. (Bayen Decl. (Ex. 3) ¶ 80.) Notably, the "configured to communicate" language *adds* structural context rather than stripping it away. As Dr. Bayen explains, a POSA would understand that for an in-vehicle computer to be "configured to communicate" with a cell phone, it must include the kinds of concrete communication interfaces and implementations that enable such communication—e.g., wired or wireless

22

interfaces, along with known protocols and programming that operate those interfaces. (*Id.*) Those are known classes of structural components in computing systems. (*Id.*)

Toyota tries to bolster its § 112(f) theory with a "state of the art" narrative: Dr. Shoemake asserts that, in 2004, "communication between a vehicle-mounted computer and a cell phone was not supported by any well-established standard." (Shoemake Decl. (Ex. 4) ¶ 59.) That argument is misplaced. The § 112(f) threshold inquiry is not whether the automotive industry had converged on a single, widely deployed "standard" for phone–vehicle integration by 2004; it is whether the claim language—here, a structural "computer" that is "configured to communicate" with another electronic device—would be understood by a POSA as naming sufficiently definite structure (or a class of structures). As discussed above, a POSA would understand what structure or class of structures are contemplated by these claims. The mere fact that the computer is mounted to the vehicle does not fundamentally change how a POSA would understand how that computer communicates with other devices. Toyota's "no standard" argument is therefore not a basis to rewrite this ordinary structural limitation into a § 112(f) "means" term or to demand an "algorithm" disclosure for the generic act of inter-device communication.

Accordingly, "said computer being configured to communicate" requires no construction and does not invoke § 112(f). (Bayen Decl. (Ex. 3) ¶ 81.)

### C.    "Said Computer … Configured to Cause … Thereby Causing …"

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "said computer … configured to cause … thereby causing …" ('131 patent, claims 1, 11) | plain and ordinary meaning "computer": plain and ordinary meaning, i.e., an electronic device or component with a data | means plus function • function: to cause said cell phone to transmit a self-determined location of said cell phone and a destination signal based on said user input over a cellular network to a networked computer facility; thereby causing said cell phone to receive map data |

| | processor<br><br>"configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function)<br><br>"cause" / "causing": plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result | from said networked computer facility over said cellular network, and to cause said map data to be transmitted from said cell phone to said computer such that a map based on said map data is displayed on said display and shows said self-determined location of said cell phone, said route and said traffic conditions along said route<br>• structure: none; indefinite<br><br>"configured to": designed/arranged/programmed to; not merely capable of |
|---|---|---|

As explained above, "computer" and "configured to" have readily ascertainable plain and ordinary meanings that provide concrete structure and describe the computer's set-up and design—i.e., a processor-based in-vehicle computer that is programmed or otherwise set up to perform the recited functions. Dr. Bayen further explains that the "cause/causing" language is likewise used in its ordinary sense, and that Toyota's attempt to treat this ordinary claim language as a § 112(f) "means" limitation is unfounded. (Bayen Decl. (Ex. 3) ¶¶ 82–88.)

"Cause" and "causing" have a straightforward meaning: to bring about, make happen, initiate, or trigger an effect or result. (Bayen Decl. (Ex. 3) ¶ 83; *Cause*, MERRIAM-WEBSTER DICTIONARY (Ex. 5) Plaintiff_010661); *Cause*, COLLINS ENGLISH DICTIONARY (Ex. 5) Plaintiff_010677); *Cause*, CAMBRIDGE DICTIONARY (Ex. 5) Plaintiff_010647).) And in the context of distributed systems and device communications, a POSA would understand that "A causes B to do X" commonly means that A issues an instruction, request, signal, or command that triggers B to perform X. (Bayen Decl. (Ex. 3) ¶ 84.)

Read in context, the claim lays out a communication flow among expressly recited structural components—"a computer mounted to said vehicle," "a cell phone … separate from

said computer and said vehicle," "a cellular network," and "a networked computer facility"—culminating in display of a map and related information. (Bayen Decl. (Ex. 3) ¶¶ 85–86; '131 patent, claims 1, 11.) For the same reasons discussed above, this is not an attempt to claim an unexplained functional black box. Rather, each "causing" step corresponds to an interaction between structural devices in a particular physical system, which can be implemented through known classes of communication links. (Bayen Decl. (Ex. 3) ¶¶ 85–87.)

Toyota's expert Dr. Shoemake argues that "the '131 patent discloses no structure or algorithm whatsoever for performing this multi-step causal control operation." (Shoemake Decl. (Ex. 4) ¶ 60.) That critique is again inapposite because it presupposes Toyota's threshold premise: that the limitation is subject to § 112(f) and therefore the specification must disclose a "corresponding structure" (and potentially an algorithm). But this limitation is not cast as a "means for" term; it is anchored by structural terms such as "computer" and "cell phone" and further described by ordinary "configured to" and "cause/causing" language. As this Court has repeatedly recognized in rejecting similar attempts to manufacture § 112(f) issues from ordinary claim language, functional phrasing that modifies a structural component does not strip that structure away or convert the claim into a structureless "means." *See, e.g.*, *Stellar*, at 27–29; *CDN*, 2021 WL 3615908, at *11–13.

Accordingly, "said computer … configured to cause … thereby causing …" requires no construction and does not invoke § 112(f). If the Court elects to construe the phrase, it should do so in accordance with its plain meaning as proposed by Nortrup.

### D.    "Said Cell Phone Interface Being Configured … Thereby Causing …"

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "said cell phone | plain and ordinary meaning<br>"cell phone interface": plain and ordinary | means plus function |

| interface being configured …thereby causing…" ('131 patent, claim 24) | meaning, i.e., hardware and/or software of a computer, such as ports, transmitters and/or receivers, that allows it to communicate with a cell phone  "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function)  "causing": plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result | • function: to cause said cell phone to transmit a self-determined location of said cell phone, thereby causing said cell phone to receive map data, and to cause said map data to be transmitted from said cell phone to said computer  • structure: none; indefinite  "configured to": designed/arranged/programmed to; not merely capable of |

### 1. "Cell Phone Interface" Has a Readily Ascertainable Plain and Ordinary Meaning, as Described by Nortrup's Proposed Construction.

As discussed above, "configured to" and "cause/causing" have readily ascertainable plain and ordinary meanings, and nothing about those phrases transforms otherwise structural claim language into a "means" limitation. This dispute therefore turns primarily on Toyota's contention that "cell phone interface" is supposedly "structureless." Again, Dr. Bayen explains that a POSA would not understand it that way. (Bayen Decl. (Ex. 3) ¶¶ 89-92.)

Dr. Bayen and the ordinary sources he cites confirm that an "interface" is a concrete connection point or link by which systems communicate. (*Id.*) For example, the Cambridge Dictionary defines "interface" as "a connection between two pieces of electronic equipment," and gives the example: "My computer has a network interface, which allows me to get to other computers." (Bayen Decl. (Ex. 3) ¶ 90; *Interface*, CAMBRIDGE DICTIONARY (Ex. 5) Plaintiff_011010).) Merriam-Webster similarly defines "interface" as "the place at which independent systems meet and act on or communicate with each other." (Bayen Decl. (Ex. 3) ¶ 90; *Interface*, MERRIAM-WEBSTER DICTIONARY (Ex. 5) Plaintiff_011024).) Consistent with those definitions, Dr. Bayen explains that a POSA would readily understand "cell phone interface" as

26

the concrete hardware and associated software that enables communication between the in-vehicle computer and a cell phone. (Bayen Decl. (Ex. 3) ¶ 90.) In practical engineering terms, that encompasses known communication interface implementations (wired and/or wireless), including (for example) ports and radio/transceiver hardware, together with the protocol stacks and supporting software that operate those interfaces—structural components that were understood at the relevant time. (*Id.* at ¶ 91.)

The intrinsic record aligns with that ordinary meaning. Claim 24 expressly recites "a computer having a cell phone interface integrated into said vehicle" and a "cell phone being separate from said computer and said vehicle," and then describes a communication sequence between those structural actors. (Bayen Decl. (Ex. 3) ¶¶ 94–96; '131 patent, claim 24.)

Accordingly, "cell phone interface" (and the surrounding "configured" / "causing" language) requires no construction. But if the Court elects to construe "cell phone interface," it should adopt Nortrup's plain-meaning proposal.

### 2.    Section 112(f) Does Not Apply to "Said Cell Phone Interface Being Configured … Thereby Causing …"

Toyota's argument that "said cell phone interface being configured … thereby causing …" is means-plus-function fails for the same reasons Toyota's other § 112(f) arguments fail: it assumes the conclusion (that this is a "means" limitation) and then faults the patent for not allegedly disclosing "corresponding structure" or an "algorithm" for a limitation that is not written in means-plus-function form. (*See* Shoemake Decl. (Ex. 4) ¶¶ 60–65.)

First, the limitation itself recites concrete structural components and their interaction. Dr. Bayen identifies the structural actors expressly named in the claim—"a computer having a cell phone interface integrated into said vehicle," "a cell phone" separate from the vehicle and computer, a "cellular network," and a "networked computer facility"—and explains that a POSA

27

would immediately recognize these as known classes of structures and encompassing understood communication sequences among them. (Bayen Decl. (Ex. 3) ¶¶ 94–96; '131 patent, claim 24.) That is not the kind of "black box" claiming § 112(f) is designed to address.

Second, "interface" terminology is routinely treated as structural. The Federal Circuit and Courts in this District have consistently rejected § 112(f) arguments directed to "interface" terms, recognizing that "interface" connotes sufficiently definite structure to a POSA. *See, e.g.*, *Apex*, 325 F.3d at 1374 (finding "interface circuit" structural); *Genband USA LLC v. Metaswitch Networks Ltd.*, No. 2:14-CV-33-JRG, 2015 WL 4722185, at *13 (E.D. Tex. Aug. 7, 2015) ("[T]he word 'interface' connotes structure such that the 'telecommunications interface module . . .' term is not a means-plus-function term."); *Intell. Ventures II LLC v. BITCO Gen. Ins. Corp.*, No. 6:15-CV-59, 2016 WL 125594, at *14 (E.D. Tex. Jan. 11, 2016) ("'[I]nterface' is not a verbal construct but rather connotes sufficiently definite structure to one skilled in the art . . . [and is] not a means-plus-function term . . . ."); *Perdiem Co, LLC v. IndusTrack LLC*, No. 2:15-CV-727-JRG, 2016 WL 3633627, at *44 (E.D. Tex. July 7, 2016) ("Defendants have failed to demonstrate that the term 'interfaces' does not connote structure. . . . The Court therefore hereby expressly rejects Defendants' arguments that this 'interfaces' term is a means-plus-function term."). Those holdings apply with even greater force here, where the claim recites not just an "interface," but a specific "cell phone interface" integrated into a vehicle-mounted computer to enable inter-device communication. (Bayen Decl. (Ex. 3) ¶¶ 90–92, 94–96.)

Third, Dr. Shoemake's insistence that the '131 patent "discloses no structure or algorithm whatsoever" for the "multi-step causal control operation" (Shoemake Decl. (Ex. 4) ¶ 60) is inapposite because it again presupposes § 112(f) treatment. As noted above, this Court has recently rejected materially similar attempts to demand an "algorithm" for non-§ 112(f) claim

language merely because the claim recites what a structural component is configured to do. *Stellar*, at 12, 26–29 ("[T]he algorithm requirement is only triggered when the limitation is a means-plus-function limitation under step one of the analysis.") (quoting *Cypress Lake Software*, 382 F. Supp. 3d. at 666). And as addressed above regarding "cause/causing," the "cause" language here is used in its ordinary sense and encompasses triggering another device's response (e.g., via transmitting a signal/request/command), not some special-purpose, undisclosed "control logic" that converts the claim into functional "means" claiming.

In short, Toyota's § 112(f) position depends on ignoring the structural terms within the claim language (e.g., "computer," "cell phone," "cellular network," "networked computer facility," and "cell phone interface") and that a POSA would understand how these claimed structures interoperate. (Bayen Decl. (Ex. 3) ¶¶ 92–96.) The Court should therefore again reject Toyota's attempt to invoke § 112(f) and adopt a plain and ordinary meaning construction.

### E.    "A Self-Determined Location of Said Cell Phone"

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "a self-determined location of said cell phone" ('131 patent, claim 1, 11, 24, 29) | plain and ordinary meaning<br>"self-determined location": plain and ordinary meaning, i.e., a location determined by the device itself | a current location of a first cell phone, as determined by the first cell phone itself without use of an in-vehicle integrated navigation system |

The term "a self-determined location of said cell phone" presents the same issue already addressed above in Section V.B regarding "a current location of a first cell phone, as determined by the first cell phone." Toyota advances the same proposed negative limitation—"without use of an in-vehicle integrated navigation system"—and relies on the same theory that prosecution history purportedly requires that limitation. For the same reasons explained in Section V.B, Toyota's construction should be rejected and the plain and ordinary meaning should control.

"Self-determined location of said cell phone" is straightforward. A POSA would understand it to mean what it says: a location determined by the cell phone itself rather than a location determined by some other device. Dr. Bayen explains that this language identifies the source of the location determination (the phone) and does not impose an additional exclusionary requirement that the system operate "without use" of any vehicle-side inputs associated with an in-vehicle navigation system. (Bayen Decl. (Ex. 3) ¶¶ 60-66, 100.) The claim language simply does not support Toyota's attempt to graft that negative limitation onto the term.

Nor does the intrinsic record supply any basis to rewrite "self-determined location" into Toyota's "without use" formulation. Toyota's position depends on the same alleged "disclaimer" already addressed above, and it fails for the same reasons: there is no clear and unmistakable surrender of claim scope that would justify importing a negative limitation that the patentee did not claim. (*See supra* Section V.B.)

Moreover, Shoemake's further reliance on the '131 prosecution remark that the "in-vehicle computer system causes a *discrete* cell phone to transmit a self-determined location" adds nothing. (Shoemake Decl. (Ex. 4) ¶ 70 (emphasis in original).) It merely restates that the phone is separate/discrete from the in-vehicle computer and determines its own location; it is not a clear and unmistakable disclaimer that would justify importing Toyota's negative limitation.

Accordingly, "a self-determined location of said cell phone" requires no construction. But if the Court elects to construe the term, it should construe it according to its plain meaning (i.e., a location determined by the device itself).

## VII.    CONCLUSION

For the foregoing reasons, Nortrup requests the Court find that each of the terms have its plain and ordinary meaning, or in the alternative adopt the plain meaning constructions that Nortrup has proposed.

30

DATED this 16th day of January, 2026.

By:     */s/ David K. Ludwig*

David K. Ludwig
Georgia Bar No. 616971
Steven G. Hill
Georgia Bar No. 354658
Hill, Kertscher & Wharton, LLP
3625 Cumberland Blvd., SE
Suite 1050
Atlanta, Georgia 30339-6406
T:  (770) 953-0995
F:  (770) 953-1358
Email: dludwig@hkw-law.com
Email: sgh@hkw-law.com

*Counsel for Plaintiff Edward Nortrup*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above document was served via the Court's CM/ECF system, which sends notifications of such filing to all counsel of record who have consented to accept service by electronic means, on January 16, 2026.

*/s/ David K. Ludwig*
David K. Ludwig
