# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| EDWARD NORTRUP,<br><br>                    Plaintiff,<br><br>        v.<br><br>TOYOTA MOTOR CORPORATION,<br>TOYOTA MOTOR NORTH AMERICA,<br>INC., TOYOTA MOTOR SALES,<br>U.S.A., INC., and TOYOTA MOTOR<br>ENGINEERING & MANUFACTURING<br>NORTH AMERICA, INC.<br><br>                    Defendants. | Case No.: 4:25-CV-328-SDJ<br><br>**JURY TRIAL DEMANDED** |

**DECLARATION OF ALEXANDRE BAYEN, PH.D.**

I, Alexandre Bayen, hereby declare as follows:

## I.    INTRODUCTION

1.    I have been retained by Plaintiff Edward Nortrup ("Plaintiff" or "Nortrup") as an expert witness in this patent infringement action against Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively, "Defendants" or "Toyota").

2.    I have been asked to render opinions regarding claim construction issues pertaining to U.S. Patent Nos. 11,307,048 ("the '048 patent") and 11,874,131 ("the '131 patent") (collectively, "the Asserted Patents"). The Asserted Patents generally relate to systems and methods for locating positions and providing route, navigation, and traffic-related information to drivers, including for example by using a combination of mobile and in-vehicle devices or components. This declaration sets forth my opinions to which I would testify at a claim construction hearing, if asked. I may rely on demonstrative exhibits at such a hearing to assist in explaining my testimony. The opinions set forth in this declaration are based on information that I have been able to obtain and analyze as of the date of this declaration. If additional information later becomes available to me that changes my opinions, I understand that I may be asked to provide updated or supplemental opinions.

## II.    QUALIFICATIONS AND EXPERIENCE

3.    Based on my educational background, industry background and teaching experience, I believe I am qualified to offer opinions relating to the patented technology of the Asserted Patents.

4.    I am the Director of the Center for Information Technology Research in the interest of Society (CITRIS) and the Banatao Institute at the University of California.

5.      I served as the Founding Associate Provost for the Berkeley Space Center until October 2025 and I am currently the chair holder for the Liao-Cho Innovation Endowed Chair at the University of California, Berkeley.

6.      I am a professor of Electrical Engineering and Computer Science, and Civil and Environmental Engineering. I am also a Faculty Scientist in Mechanical Engineering at the Lawrence Berkeley National Laboratory.

7.      I received an Engineering Degree in Applied Mathematics from Ecole Polytechnique, France in July of 1998.

8.      I received M.S. and Ph.D. degrees in Aeronautics and Astronautics from Stanford University in Stanford, California in June of 1999, and January of 2004 respectively.

9.      I previously worked as the Director of the Institute of Transportation Studies at UC Berkeley (ITS) from 2014-2021 and as a Visiting Researcher at NASA Ames Research Center from 2000 to 2003. I worked as the Research Director of the Autonomous Navigation Laboratory at the Laboratoire de Recherches Balistiques et Aerodynamiques (Ministere de le Defense, Vernon, France) where I hold the rank of Major.

10.     I have been on the faculty at UC Berkeley since 2005.

11.     I am the recipient of the Ballhaus Award from Stanford University in 2004 and the recipient of the CAREER award from the National Science Foundation in 2009.

12.     I led the Mobile Century and Mobile Millennium projects as Principal Investigator, which received the 2008 Best of ITS Award for 'Best Innovative Practice' at the ITS World Congress.

13.     My academic work including Mobile Millenium has been featured more than 200 times in the media, including TV channels and the following radio stations: CBS, NBC, ABC,

CNET, NPR, KGO, and the BBC. Mobile Millenium was also featured in the popular press by the Wall Street Journal, Washington Post, and Los Angeles Times. I was also granted a TRANNY Award from the California Transportation Foundation in 2009. I was the recipient of the Presidential Early Career Award for Scientists and Engineers (PECASE) award from the White House in 2010.

14.     I am also the recipient of the Okawa Research Grant Award, the Ruberti Prize from the IEEE, and the Huber Prize from the ASCE.

15.     I am a member of several professional organizations, including the Institute of Electrical and Electronic Engineers (IEEE) and the Institute of Aeronautics and Astronautics (AIAA).

16.     I was elected to the board of Governors of the IEEE Intelligent Transportation Systems Society in 2021.

17.     I was elected to the rank of IEEE Fellow in 2023.

18.     I have co-authored two research monographs, two textbooks and co-edited one book and over 300 articles in peer reviewed journals and conferences. See my CV, which is attached hereto as Exhibit A and incorporated by reference.

19.     I am the founding director of the Mobile Sensing Laboratory at UC Berkeley.

### III.     COMPENSATION

20.     I am being compensated for my services in this matter at my usual and customary rate of $750 per hour. I am being separately reimbursed for reasonable out-of-pocket expenses incurred in connection with my work. My compensation does not depend in any way on the outcome of this litigation, or on the substance of the testimony or opinions that I provide. I have no financial interest in any party to this case or in the Asserted Patents.

3

## IV.    MATERIALS CONSIDERED

21.    My opinions are based on my education, training, and experience in the relevant technical fields, and are necessarily informed by my work and familiarity with related subject matter over the course of my career, including technical materials I have read over the years and discussions I have had with colleagues.

22.    In addition, I have reviewed and considered materials produced or exchanged in this action and materials referenced therein, including, among other things: (a) the Asserted Patents, including the claims, specification, and figures; (b) the prosecution histories of the Asserted Patents; (c) the Complaint filed in this action; (d) the parties' proposed claim constructions and supporting materials; and (e) extrinsic materials relevant to how a person of ordinary skill in the art would understand the disputed terms, including technical dictionaries, encyclopedias, and similar reference sources provided by the parties.

## V.    LEGAL STANDARDS

23.    I understand that the Court's task in claim construction is to determine the meaning of the claim terms as they would have been understood by a person of ordinary skill in the art at the relevant time, reading the claims in the context of the patent. I further understand that claim terms are generally given their plain and ordinary meaning to a person of ordinary skill in the art, and that there is a presumption that the patentee intended the ordinary meaning of the words used in the claims.

24.    I understand that, in construing claim terms, the most important evidence is the intrinsic record, namely the claim language itself, the patent's specification, and the prosecution history. The intrinsic record provides the technical and contextual framework for understanding what the claim language would have conveyed to a person of ordinary skill in the art.

4

25.     I also understand that extrinsic evidence—such as technical dictionaries, treatises, and expert testimony—may be helpful to understand background science or the ordinary meaning of a term in the relevant art or common usage during the relevant time period.

26.     I understand that there are only two recognized circumstances in which a court departs from the plain and ordinary meaning of claim terms: (1) when the patentee acts as its own lexicographer by clearly defining a term and clearly expressing an intent to define it, or (2) when the patentee clearly and unmistakably disavows (or disclaims) claim scope in the specification or during prosecution. I understand the standards for finding lexicography or disavowal are exacting; disavowal requires a "clear and unmistakable" surrender, and statements amenable to multiple reasonable interpretations generally cannot establish disclaimer. I further understand that, while lexicography or disavowal must be clear, it need not be explicitly phrased and may be implied where the patentee makes clear statements characterizing the scope and purpose of the invention.

27.     Finally, I understand that some limitations may be governed by 35 U.S.C. § 112(f) (sometimes referred to as "means-plus-function" claiming). The essential inquiry is whether the words of the claim, as understood by a person of ordinary skill in the art, are understood to name sufficiently definite structure (or a class of structures) for performing the claimed function. I understand that use of the word "means" creates a rebuttable presumption that § 112(f) applies, while the absence of the word "means" creates a rebuttable presumption that it does not.

28.     If § 112(f) applies, I understand that the proper construction generally proceeds in two steps: first, identifying the function recited in the claim; and second, identifying the corresponding structure in the specification that is clearly linked to performing that function (and

construing the limitation to cover that corresponding structure and its equivalents). I further understand that if no corresponding structure is disclosed (or if the disclosure is insufficient for the particular type of function claimed), the limitation may be indefinite.

## VI.   PERSON OF ORDINARY SKILL IN THE ART

29.     Based on my education, training, and experience in transportation systems, mobile navigation systems, infotainment systems, and related computing and communications technologies, I am familiar with the knowledge and capabilities of a person of ordinary skill in the art ("POSA") relevant to the Asserted Patents in this case.

30.     In my opinion, at the time of the invention a POSA for purposes of the asserted patents would have had at least a bachelor's degree in electrical engineering, computer engineering, computer science, or a closely related field, and at least two years of experience with (i) location-based services (e.g., GPS, cellular triangulation), (ii) cellular devices, (iii) in-vehicle computing/infotainment systems, and/or (iv) digital map data and navigation/route guidance systems. Additional practical experience may substitute for some formal education, and additional education may substitute for some practical experience.

31.     Based on this definition, I met or exceeded the qualifications of a POSA at least as of the earliest effective filing date (Feb. 4, 2004). I set forth the opinions below from the perspective of how I believe a POSA would understand the disputed claim terms and phrases.

## VII.   TECHNOLOGY BACKGROUND

32.     The Asserted Patents describe systems and methods that combine (i) determining a user or vehicle location (e.g., via cell-tower techniques or GPS), (ii) generating or presenting route, navigation, and traffic information, and (iii) delivering that information through interfaces that may include mobile devices and in-vehicle systems. To assist the Court in understanding the technological environment in which these concepts arose, this section summarizes the state of

navigation and location-based technologies around 2004 and how those technologies ultimately evolved into the modern connected ecosystem.

33.     By the early-to-mid 2000s, in-vehicle navigation features were becoming more common, but the systems of that era were typically self-contained and data-static. Automakers offered optional head units that relied on DVD-based map databases or other onboard storage, and these systems generally lacked continuous network connectivity for traffic updates or dynamic rerouting. Their architectures were largely closed, with proprietary hardware and software stacks. As a result, even though turn-by-turn guidance was available in some 2004 vehicles, these systems were not cloud-connected and did not utilize real-time, crowd-sourced traffic data or portable computing devices as part of the navigation process.

34.     During the same period, the aftermarket "portable navigation device" (PND) category expanded rapidly. TomTom, for example, released the TomTom GO in 2004 as an all-in-one dashboard navigation device:



(John R. Delaney, *TomTom GO review: TomTom GO*, CNET (Jul. 22, 2004), https://www.cnet.com/roadshow/reviews/tomtom-go-review/ (Ex. B).) By 2005, early mobile phones with navigation capabilities were beginning to appear. As the New York Times reported

in December 2005, Motorola's i870 included GPS navigation with turn-by-turn directions, and the BlackBerry 7520 likewise offered integrated GPS-based navigation features. (Michel Marriott, *GPS Navigation Moves to Your Palm*, NEW YORK TIMES (Dec. 15, 2005), *available at* https://www.nytimes.com/2005/12/15/technology/gps-navigation-moves-to-your-palm.html (Ex. C).)

35.     In the early 2000s, the deployment of location technologies in cellular networks was driven heavily by the federal government's E911 mandate, which required carriers and handset manufacturers to provide emergency services with the ability to determine a caller's location. (*See* Ex. C ("The federal government requires mobile phone makers to embed location technology in phones sold in the United States, to help emergency services locate people when they call 911 in emergencies.").) This regulatory environment accelerated the development of location techniques such as cell-tower–based positioning and GPS-equipped mobile devices, but it did not yet produce the consumer-facing, cloud-connected navigation ecosystem that later emerged.

36.     Over the next several years, multiple technology shifts converged. Smartphones became more capable, sensors improved, and devices increasingly incorporated built-in GPS, as with Apple's iPhone 3G in 2008. As cloud services expanded, it became substantially more practical to compute routes and provide turn-by-turn guidance directly on the phone. This period also saw the rise of crowd-sourced data approaches for estimating traffic and planning routes. In 2009, Google announced Google Maps Navigation, which provided "Internet-connected GPS navigation" with live traffic, satellite imagery, and search-based routing, initially launching on early Android devices. (*Announcing Google Maps Navigation for Android 2.0*, GOOGLE OFFICIAL BLOG (Oct. 28, 2009), https://googleblog.blogspot.com/2009/10/ (Ex. D).) This marked

a transition from static mapping solutions to continuously updated, service-oriented navigation platforms.

37.    A further evolution, highly relevant to understanding where the industry ultimately went, was the shift from "a phone being present in the car" to true phone-vehicle integration. Apple's March 2014 CarPlay announcement introduced an interface that allowed iPhones to drive navigation, messaging, and other applications while presenting those functions safely through the vehicle's built-in display and controls. (*Apple Rolls Out CarPlay Giving Drivers a Smarter, Safer & More Fun Way to Use iPhone in the Car*, APPLE NEWSROOM (Mar. 3, 2014), https://www.apple.com/newsroom/2014/03/03Apple-Rolls-Out-CarPlay-Giving-Drivers-a-Smarter-Safer-More-Fun-Way-to-Use-iPhone-in-the-Car/ (Ex. E).) Google introduced Android Auto around the same time, providing analogous integration for Android devices. (Tom Huddleston Jr., *Google Unveils Android Auto to Sync Devices with Vehicles*, FORTUNE (Jun. 25, 2014), *available at* https://fortune.com/2014/06/25/google-android-auto/ (Ex. F).) These integration platforms embraced a design philosophy that has since become ubiquitous: the smartphone supplies frequently updated, cloud-connected services, while the vehicle supplies the driver-oriented human-machine interface (e.g., larger displays, steering-wheel controls, integrated microphones).

38.    In summary, although navigation, traffic estimation, and location technologies existed in 2004–2005, they were fragmented and limited. Vehicle systems were largely offline and relied on static media; portable GPS devices were growing but remained stand-alone; and cellular-based navigation was emerging slowly and was shaped by both device limitations and regulatory-driven deployment. Over time, the industry evolved decisively toward integration and connectivity (the very model described in the Asserted Patents), linking mobile devices, cloud-

based services, and in-vehicle user interfaces. Modern systems such as CarPlay and Android Auto reflect that trajectory by making phone-based navigation and connected services available directly through the vehicle's built-in display and controls.

## VIII.   DISPUTED CLAIM TERMS IN THE '048 PATENT

### A.    "An In-Vehicle Data Receiver Forming a Part of a Vehicle Configured to Receive" (Claims 1, 13, 15) / "A Data Receiver Configured to Receive" (Claim 17)

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "an in-vehicle data receiver forming a part of a vehicle configured to receive…" ('048 patent, claims 1, 13, 15) "a data receiver configured to receive …" ('048 patent, claim 17) | plain and ordinary meaning "data receiver": plain and ordinary meaning, i.e., a device or component that receives data or signals, for example in the form of electromagnetic radiation or electrical impulses, from one or more other devices or components "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | means plus function • function: receive a roadway map of an area proximate a current location of a first cell phone, as determined by the first cell phone, and a route from the current location to a destination based, at least in part, on an estimated roadway traffic condition • structure: none; indefinite "configured to": designed/arranged/programmed to; not merely capable of |

### 1.    The Disputed Phrase Is Best Analyzed as Two Separate Components ("Data Receiver" and "Configured To").

39.    The disputed claim language—"an in-vehicle data receiver forming a part of a vehicle configured to receive" ('048 patent, claims 1, 13, 15) and "a data receiver configured to receive" ('048 patent, claim 17)—contains two constituent parts that should be addressed separately: (1) the meaning of "data receiver," and (2) the meaning of "configured to."

40.     From the perspective of a person of ordinary skill in the art ("POSA"), these two elements perform different roles in the claim language. "Data receiver" identifies the type of component at issue—i.e., the kind of device or circuit element the claim is talking about. "Configured to," by contrast, addresses the state of that component—i.e., whether it is set up, arranged, or programmed so that it can perform the recited receiving function in its ordinary operation. Treating the entire phrase as a single, purely functional "black box" obscures this distinction and risks collapsing a structural term ("receiver") into a purely functional characterization.

41.     Analyzing the constituent parts separately is also consistent with how engineers and designers use these terms in real technical work. When engineers describe a "receiver," they are referring to a known class of components that receive incoming data or signals. When engineers say a receiver is "configured to" do something, they are typically speaking about the receiver's setup—hardware selection, firmware/software configuration, interfaces enabled, protocols supported, and/or related parameters—rather than whether the word "receiver" ceases to denote structure.

42.     Accordingly, I address "configured to" first because, in my view, the parties' positions on that phrase substantially converge. I then address whether "data receiver" is a well-known structural term (and, relatedly, why Toyota's § 112(f) characterization is not warranted once the constituent terms are properly understood in their ordinary technical sense).

### 2.     "Configured to" Has a Settled Ordinary Meaning, as Reflected in the Parties' Proposed Constructions.

43.     In my opinion, there is little substantive dispute between the parties regarding the meaning of "configured to." Nortrup proposes that "configured to" should be given its plain and ordinary meaning—i.e., "designed, arranged, programmed, equipped, or otherwise set up to

11

perform" the recited function. Toyota similarly proposes "designed/arranged/programmed to," while emphasizing—correctly—that "configured to" is not the same as "merely capable of."

44.    That distinction is consistent with ordinary English usage, how engineers use the term, and how the patent specification uses the term. (*See, e.g.*, '048 patent, 36:40-46, 39:49-56.) General and technical dictionaries describe "configure" as arranging something into a particular form or arrangement, and (especially in the computing context) setting up or making changes to a system so it is able to do a particular task or is ready for use:

- Cambridge Dictionary (Plaintiff_010833): "to arrange something or put its parts together in a particular form or arrangement"; "to arrange or make changes to a computer system, a piece of computer equipment or software, etc. to make it able to do a particular task or work in a particular way";

- Collins English Dictionary (Plaintiff_010842): "If you configure a piece of computer equipment, you set it up so that it is ready for use.";

- Merriam Webster's Collegiate Dictionary (2004) (TOYOTA_378936): "to set up for operation esp. in a particular way."

Put differently: "configured to" implies the relevant components (hardware, software, or both) are already set up such that the claimed function can be performed in ordinary usage, without substantial modification necessary to add the function.

45.    A simple analogy illustrates the point. A brand-new personal computer without Microsoft Office installed is "capable of" running Microsoft Word for word processing in the sense that it could do so if Word were later installed. But that computer is not "configured to" perform Word-based word processing until the required software is installed (or otherwise provided) such that the function is actually enabled on the device as supplied. Thus, "capable of"

12

can include situations requiring later modification (e.g., installing additional software, adding a missing module, changing hardware), while "configured to" connotes that the device is already set up for the function.

46.     Applied here, a POSA would understand "configured to receive" to require that the data receiver is set up—by design, arrangement, programming, or equipping—to receive the recited data as part of its intended operation, not merely that it could be altered at some later time to do so. This understanding does not require constant use or continuous operation; it simply reflects that the receiving functionality is present and enabled in the claimed system as arranged.

### 3.     "Data Receiver" Has a Well-Recognized Structural Meaning in the Art, as Reflected in Nortrup's Proposed Construction.

47.     In my opinion, a POSA would understand the term "data receiver" in its plain and ordinary sense as referring to a known class of physical structures—i.e., a device, circuit, or component that receives incoming signals or data from another device or component. In the communications and electronics context, the term "receiver" has long denoted specific, concrete hardware that accept incoming transmissions over some medium (wired or wireless) and provide corresponding outputs usable by other circuitry or components.

48.     The extrinsic evidence Toyota itself cites confirms that "receiver" is a well-understood structural term. For example, a widely used technical definition describes a receiver as "a circuit that accepts signals from a transmission medium" and then "decodes or translates" those signals into a form that can drive local circuits. (*What Is a Receiver?*, ANALOG DEVICES (TOYOTA_378939).) Likewise, Toyota's cited Encyclopedia Britanica passage explains that receivers accept selected signals and convert them into usable forms (often with amplification and processing). (*Receiver*, ENCYCLOPEDIA BRITANICA (TOYOTA_378938); *see also Intro to Electrical Engineering Key Term – Receiver*, FIVEABLE (Plaintiff_011266) ("A receiver is a

13

device or component in a communication system that captures and decodes signals sent over a medium, such as radio waves, optical fibers, or cables."); *Receiver*, COLLINS ENGLISH DICTIONARY (Plaintiff_011303) ("A receiver is a circuit that accepts signals from a transmission medium and decodes or translates them into a form that can drive local circuits.").) A POSA would further understand that the term "receiver" refers not merely to an abstract function, but to a class of concrete physical structures used to receive signals, which vary depending on the signal type. For example, a receiver for electromagnetic signals typically includes an antenna; a receiver for wired electrical signals typically includes an input port; and a receiver for acoustic signals typically includes a transducer such as a microphone. These receiving elements are coupled to known processing circuitry (e.g., signal conditioners, amplifiers, filters, demodulators, or decoders) that together form the receiver structure. These descriptions are structural and functional in the ordinary engineering way: they identify what a receiver is (a device/circuit/component) and what it does (receive and convert/decode), analogous to other well-known structural components (e.g., transmitters, encoders, decoders, processors).

49.     The claim language reinforces this understanding. The term appears as "an in-vehicle data receiver forming a part of a vehicle" and "a data receiver configured to receive," in each instance further being part of in "[a]n in-vehicle computer system." The "forming a part of a vehicle" and "in-vehicle computer system" language is a structural locator: it points the reader to a receiver implemented in or as part of the vehicle's electronics. A POSA would naturally understand that the "data receiver" encompasses conventional receiver components used in vehicle systems to receive data—such as receivers associated with wired interfaces (e.g., USB) and/or wireless interfaces (e.g., Bluetooth, Wi-Fi). Indeed, claims 3 and 4 of the '048 patent

provide further confirmation that "data receiver" is used in its ordinary sense, as these claims specify the type of connection (wired or wireless) used by the receiver.

50.    The intrinsic record is also consistent with this plain meaning. The asserted patents describe systems in which information is transmitted between devices (including mobile devices and in-vehicle systems) and received for use in providing maps, routes, navigation, and related information. That technical architecture presupposes conventional receiver functionality on the receiving side—implemented using standard receiver hardware and associated circuitry— exactly as a POSA would expect. Nothing in the intrinsic disclosure suggests that "receiver" is being used as a substitute for the word "means," or as a purely functional nonce term divorced from known structures.

51.    For these reasons, a POSA would view "data receiver" as connoting sufficient structure to avoid means-plus-function treatment. The claims do not use the word "means," and the term "receiver" itself is a recognized name for structure in electronics and communications. The fact that the receiver is further described as "configured to receive" certain categories of information (e.g., map and route-related data) does not strip away structure; it merely specifies the receiver's intended role in the claimed system.

52.    Accordingly, in my opinion, the term "data receiver" should be construed according to its plain and ordinary meaning as a structural component that receives data or signals from one or more other devices or components (including, by way of example, implementations receiving electromagnetic radiation or electrical impulses), consistent with both the extrinsic technical definitions and the intrinsic disclosure.

### 4.    The Terms are Not Means-Plus-Function Because They Recite Sufficient Structure.

53.    Toyota contends that the phrases "an in-vehicle data receiver forming a part of a vehicle configured to receive …" and "a data receiver configured to receive …" are means-plus-function limitations with no corresponding structure and therefore indefinite. I disagree for several reasons grounded in how a POSA would understand this language in view of the intrinsic record and common technical usage.

54.    First, as discussed above, a POSA would understand "data receiver" to denote a known class of structures in electronics and communications—not a "nonce" placeholder for an unspecified means.

55.    Second, the claim language itself reinforces structure, not absence of structure. In claims 1/13/15/17, the language "an in-vehicle data receiver forming a part of a vehicle" conveys a concrete component integrated with the vehicle—i.e., a physical receiver within the vehicle architecture. A POSA would understand this as the receiving hardware (or receiving subsystem) by which the vehicle receives data (e.g., via USB cable, Wi-Fi/Bluetooth transceiver operating in a receive mode, or other vehicle communications hardware), as implemented in the relevant system context.

56.    Third, Toyota's characterization effectively treats ordinary functional description of a structural component as eliminating the structure. But it is routine in engineering (and in patents describing engineering systems) to describe a structural element by what it is "configured to" do. Here, "configured to receive …" simply describes the receiver's operative setup to perform its receiving function. That does not negate the existence of structure; it describes how the known structure is arranged/programmed/implemented in the system.

16

57.    Fourth, the specification is consistent with this structural understanding. The Asserted Patents' specification repeatedly describes communications and navigation architectures involving mobile devices, in-vehicle systems, wireless networks, and the exchange of information such as routes, maps, traffic, and navigation data. (*See, e.g.*, '048 patent, 14:15-20, 16:57-59, Fig. 35, 20:16-47, 24:28-32, 37:39-55.) In that context, an in-vehicle "data receiver" is exactly the sort of known receiving hardware a POSA would expect to exist and to be used to obtain such data in a vehicle environment (e.g., via wireless/cellular or other radio-based communications). Nothing in the specification suggests "receiver" is being used as a purely functional placeholder divorced from known hardware.

58.    Finally, because a POSA would read "data receiver" as connoting structure, Toyota's "structure: none; indefinite" position does not follow.

### 5.    Conclusion

59.    In my opinion, the disputed phrases should be given their plain and ordinary meaning consistent with how a POSA would understand them. The term "data receiver" (including an "in-vehicle data receiver") denotes a known structural component—i.e., a device/circuit/component that receives data/signals. The phrase "configured to" then describes that structural component as set up (by design, arrangement, programming, or implementation) to perform the stated receiving function in the claimed system. Because "data receiver" is a recognized structural term in the relevant art and the claims/specification use it in a manner consistent with that structural meaning, I do not agree that these limitations invoke §112(f), nor do I agree that they are indefinite for lacking structure.

**B.**    **"A Current Location of a First Cell Phone, as Determined by the First Cell Phone" (Claims 1, 17) / "A Current Location" (Claim 13, 15)**

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "a current location of a first cell phone, as determined by the first cell phone"<br><br>(claims 1, 17)<br><br><br>"a current location"<br><br>(claim 13, 15) | plain and ordinary meaning<br><br>"current location": plain and ordinary meaning, i.e., present location | a present location of a first cell phone, as determined by the first cell phone without use of an in-vehicle integrated navigation system |

60.    The claim language at issue appears in two forms. Claims 1 and 17 of the '048 patent recite "a current location of a first cell phone, as determined by the first cell phone," while claims 13 and 15 refer more generally to "a current location." In both formulations, the term "current location" is used in its ordinary sense, i.e., the present geographic location of the relevant device.

61.    Nortrup proposes that no construction is necessary: "current location" means the present location, and "as determined by the first cell phone" simply identifies which device makes the final location determination. Toyota, however, seeks to add an additional negative limitation by rewriting the claim language to require that the current location must be determined by the cell phone "without use of an in-vehicle integrated navigation system." That language does not appear anywhere in the claims, and in fact contradicts at least one claim.

62.    Toyota's argument rests on its assertion that the intrinsic record contains a clear and unmistakable disclaimer of any system in which the cell phone might receive or consider location-related information originating from the vehicle. In substance, Toyota is attempting to

narrow the claim scope by importing a categorical exclusion—prohibiting any use or consideration of vehicle-provided data—based on its reading of the prosecution history.

### 1.    Neither the Claims nor the Specification Prohibit Inputs from the Vehicle.

63.    In my opinion, the intrinsic record does not support Toyota's attempt to convert the phrase "a current location of a first cell phone, as determined by the first cell phone" into a categorical prohibition on vehicle involvement. The claim language addresses what makes the determination—the cell phone—not what information the phone may consider in reaching that determination. Nothing in the claims states that the phone must determine its current location "without use of" any vehicle-provided information, or that location-related data originating from the vehicle may never be provided to, considered by, or compared against data used by the phone. Read in ordinary technical context, the limitation requires that the phone be the final arbiter of its "current location" (i.e., the location the system treats as the phone's location for purposes of the claimed functionality), but it does not require the phone to operate in isolation from the broader in-vehicle environment or to ignore data that may be available from other system components, such as speedometer and/or in-vehicle GPS data. (*See, e.g.*, *Determine*, MERRIAM-WEBSTER DICTIONARY (Plaintiff_010872-73) ("to find out or come to a decision about by investigation, reasoning, or calculation").) Rather, the claims allow the phone to consider multiple data sources, including data from the phone itself and data from the vehicle, and synthesize them into a final location determination for use in navigation.

64.    The specification is consistent with this understanding. It repeatedly describes navigation and mapping systems that may generate or update route suggestions based on a variety of inputs, including "external data." For example, in describing the in-vehicle mapping/nav embodiments, the specification explains that "the computing facility may

19

regenerate new route suggestions based on route information provided by the user, GPS facility, locating facility, *external data* or internal data." ('048 patent, 19:16-21 (emphasis added).) The same concept is repeated in the description of networked and local mapping facilities, again stating that route suggestions may be regenerated based on information from a "GPS facility," a "locating facility," and "external data." ('048 patent, 19:35-39.) A POSA would understand "external data" in this context to mean data originating outside the component performing the determination—without any limitation excluding vehicle-originated inputs. In other words, the written description confirms that the overall system is designed to operate using a combination of inputs and signals (including inputs external to a given device), rather than imposing any rule that location determinations must be made without consideration of information from other subsystems.

65.    The broader disclosure also contemplates that the vehicle itself may possess location capabilities and participate in navigation operations. For instance, the specification describes a "mobile mapping facility" in an automobile that "may include a GPS or other locating facility to provide location information to the computing facility," and explains that the system may regenerate route suggestions based on information from GPS/locating facilities and other sources. ('048 patent, 18:65-19:21.) This is consistent with an integrated architecture in which vehicle-sourced information and phone-sourced information may both exist and be exchanged within the system, while still preserving the requirement—express in the claim language—that the "current location" at issue is the phone's location "as determined by the first cell phone."

66.    Finally, the claim set as written in the related '131 patent is inconsistent with Toyota's proposed categorical exclusion. Claim 10 expressly contemplates that the in-vehicle

system may have a vehicle GPS device that transmits a vehicle GPS location signal, which is "distinct from" the cell phone's "self-determined location." That claim language confirms that the intrinsic record envisions embodiments where (i) the vehicle has its own GPS-derived location signal and (ii) the phone still determines its own location for purposes of the claimed invention. This reading is reinforced by the specification itself. In connection with support for claim 10, the applicant during prosecution pointed to the portion of the specification describing FIG. 7 ('131 Patent Prosecution, Supplemental Response to Non-Final Office Action dated Oct. 26, 2023, p. 9), which explains that, although many embodiments rely on cell-phone-based triangulation techniques, "the inventors envision many alternate transmission and location systems… [f]or example, a vehicle, cell phone or other device may be equipped with a GPS locating facility and the device may transmit its location to another facility" ('048 patent, 20:16-47). This passage and the corresponding dependent claim again make clear that the patents expressly contemplate vehicles equipped with GPS hardware that can transmit GPS-derived location information to other system components. That disclosure and claim are thus directly incompatible with Toyota's contention that the intrinsic evidence contains a clear and unmistakable disclaimer forbidding the phone from receiving or considering location-related inputs from the vehicle. The only requirement supported by the intrinsic record is the one reflected in the claim language itself: the phone must be the component that ultimately determines the phone's "current location," not that it must do so without regard to any information available from the vehicle.

2.    **The Prosecution History Distinguishes Prior Art that Used an Integrated In-Vehicle GPS to Determine Vehicle/Terminal Location; It Does Not Disclaim GPS-Equipped Vehicles or Vehicle-Sourced Inputs to the Phone.**

67.    I have reviewed the prosecution histories for the Asserted Patents, including the applicant's remarks responding to the examiner's obviousness rejections. Toyota apparently relies on a passage in which the applicant explained that the pending claims "recite the use of a current location of a cell phone, as determined by the cell phone," whereas the cited references "teach[] the use [of] an in-vehicle integrated GPS system to determine a vehicle's location" and "focus[] on using an in-vehicle integrated navigation system with an integrated GPS system for determination of a current position of the vehicle." ('048 Patent Prosecution, Response to Final Office Action dated Oct. 8, 2021 (no page numbers).) The applicant further explained that, in the cited art, "[t]he integrated vehicle GPS system determines the location of the vehicle and communicates its location to a mapping service," while, "[i]n stark contrast, the present claims are directed to a system that uses a location of a first cell phone, as determined by the first cell phone, as a basis for receiving the roadway map." (*Id.*) Read in context, these remarks identify the relevant distinction the examiner's references failed to teach: the claims use the phone's location, as determined by the phone, as the location basis for receiving/providing the roadway map and route, rather than using an integrated in-vehicle GPS/navigation system to determine the vehicle/terminal's location and then directly supplying that vehicle/terminal location to a mapping service.

68.    Critically, the applicant did not state that the vehicle must lack GPS or that a vehicle-based GPS signal must never exist in a claimed system. To the contrary, the same passage Toyota apparently relies on expressly acknowledges that the vehicle may be equipped with GPS, stating: "A system in accordance with the presently claimed inventions, for example,

22

would operate as intended *whether or not the vehicle was equipped with GPS.*" (*Id.* (emphasis added).) That statement is the opposite of a categorical exclusion. It indicates that in-vehicle GPS is not required to practice the claimed invention—because the claimed location basis is the cell phone's location as determined by the cell phone—but it does not say that a vehicle cannot have GPS, cannot generate a vehicle GPS signal, or cannot communicate location-related information to the phone. In technical terms, "works whether or not the vehicle is equipped with GPS" describes optionality (GPS may be present or absent) and non-dependence (the system does not rely on vehicle-integrated GPS as the determinative location source), not a prohibition. The remainder of the applicant's discussion confirms this narrow, element-focused distinction rather than any broad surrender.

69.     In my opinion, a POSA would therefore understand these prosecution statements as clarifying the allocation and identity of the location being used—phone-determined location versus vehicle-determined location—not as a clear and unmistakable disclaimer that forbids the presence of vehicle GPS hardware, forbids a vehicle from transmitting a GPS-derived location signal, or forbids the phone from receiving or considering vehicle-sourced inputs so long as the phone ultimately determines its own current location.

### 3.     Conclusion

70.     In sum, Toyota's proposed negative limitation finds no support in the claims, specification, or prosecution history. The applicant distinguished prior art systems in which an *integrated in-vehicle GPS/navigation unit* determined the operative location, whereas the claimed inventions use the *cell phone's own location, as determined by the cell phone,* as the location basis for receiving and presenting map and route information. Nothing in the applicant's remarks states—or even suggests—that the vehicle must lack GPS hardware, that a vehicle GPS signal may not exist, or that the phone is barred from receiving or considering information that

originates from the vehicle. Indeed, the applicant expressly recognized that the invention "would operate as intended whether or not the vehicle was equipped with GPS," which is incompatible with Toyota's asserted "clear and unmistakable" disclaimer. Properly read, the prosecution history reinforces the plain meaning of the claims: the phone must determine the phone's current location, but the intrinsic record contains no prohibition on the presence or use of vehicle-provided location information.

## IX.    DISPUTED CLAIM TERMS IN THE '131 PATENT

### A.  "A Computer Mounted to Said Vehicle and Configured to Receive" (Claims 1, 11)

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "a computer mounted to said vehicle and configured to receive" ('131 patent, claims 1, 11) | plain and ordinary meaning "computer": plain and ordinary meaning, i.e., an electronic device or component with a data processor "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | means plus function • function: receive user input comprising at least a command of a destination • structure: none; indefinite "configured to": designed/arranged/programmed to; not merely capable of |

71.    The next disputed phrase concerns the limitation "a computer mounted to said vehicle and configured to receive," which appears in independent claims 1 and 11 of the '131 patent. Nortrup proposes plain and ordinary meaning for this phrase, explaining that a "computer" refers to an electronic device or component that includes a data processor, and that "configured to" means designed, arranged, programmed, equipped, or otherwise set up to perform the stated function. Toyota, by contrast, argues that the entire phrase is a means-plus-

function limitation governed by § 112(f), contending that the function is "receive user input comprising at least a command of a destination" and that the specification discloses no corresponding structure, rendering the term indefinite. As explained below, a POSA would readily understand "computer mounted to said vehicle" to identify a concrete structural component—indeed, a class of well-understood structures made even more specific by the requirement that it is mounted to the vehicle. For the same reasons, and as already discussed in my prior analysis of "configured to," the claim language here does not invoke § 112(f), and Toyota's indefiniteness theory is not supported by how a POSA would understand the term "computer" in context or by the intrinsic record.

72.    In my opinion, a POSA would immediately understand the term "computer" as referring to a physical, structural device whose defining characteristic is the presence of a processor (i.e., well-understood hardware that performs operations on data) along with supporting hardware such as memory. *(See, e.g.*, *Computer*, BRITANNICA, (Plaintiff_010778) ("The physical elements of a computer, its hardware, are generally divided into the central processing unit (CPU) [i.e., processor], main memory (or random-access memory, RAM), and peripherals.").) A processor is not an optional add-on or a mere functional label; it is the core identifying hardware that makes a device a computer rather than another type of electronic equipment.[1] Because the term "computer" inherently conveys the presence of a processor, a POSA would view it as a structural term, not a nonce word invoking § 112(f).

---

[1] Whether the main memory is considered part of the processor is largely semantic.  (*See id.* at Plaintiff_010779-80 ("Although the main memory was once considered part of the CPU, today it is regarded as separate. The boundaries shift, however, and CPU chips now also contain some high-speed cache memory where data and instructions are temporarily stored for fast access.").)

73.      Dictionaries, engineering education materials, and encyclopedias consistently define "computer" in terms that center on this data-processing hardware. Merriam–Webster generally defines a computer as "one that computes," and more specifically as "a programmable usually electronic device that can store, retrieve, and process data." (*Computer*, MERRIAM-WEBSTER DICTIONARY (Plaintiff_010803).) A POSA reading that definition in the context of the asserted patents, which describe electronic devices communicating with mobile phones and processing map, route, and navigation information, would readily understand that the claimed "computer" refers to a processor-based electronic device. Instructional materials used in engineering education reinforce this point, describing a computer as "an electronic device that manipulates [i.e., processes with a data processor] information or data." (*Computer Basics: What Is a Computer?*, GFCGLOBAL (Plaintiff_010798).)

74.      Likewise, the Encyclopedia Britannica explains that different classes of computers, from microcomputers and embedded processors to supercomputers, are defined by their data-processing hardware. (*Computer*, BRITANNICA (Plaintiff_010769-84).) For example, a "microcomputer" is "a small computer built around a microprocessor integrated circuit, or chip." (*Id.* at Plaintiff_010775.) Even more pertinent to the asserted claims, Britannica describes "embedded processors" as "small computers that use simple microprocessors to control electrical and mechanical functions" and notes that such processors "are common in automobiles." (*Id.* at Plaintiff_010777.) These definitions reflect what engineers understand intuitively: a processor is the structural hallmark of a computer, and a device equipped with such hardware is recognized as a computer in the ordinary technical sense.

75.      The claim language provides additional structural specificity beyond the processor-based structure already conveyed by the word "computer." By reciting "a computer

mounted to said vehicle," the claims identify a particular class of computers familiar to a POSA: embedded automotive computing modules, such as infotainment head units. These are physical devices located within the vehicle's electronics architecture, built around processors, and designed to receive and process data inputs. The "mounted to said vehicle" phrase therefore narrows and reinforces the term's structural meaning; it does not transform a computer into an abstraction.

76.     The specification repeatedly describes in-vehicle communication facilities, in-vehicle navigation systems, and onboard computing systems that process information, interface with displays, receive user input, and communicate with mobile devices. These disclosures are again directed to processor-based systems, i.e., computers in the ordinary, structural sense. Nothing in the written description suggests that the inventors used the term "computer" as an undefined functional placeholder. Instead, the patents treat computers as actual pieces of electronic hardware with processors to perform or assist in the performance of navigation-related tasks.

77.     For these reasons, the term "computer" in this limitation is a paradigmatically structural term, and its defining characteristic—the inclusion of a data processor—is a concept a POSA would immediately recognize. The additional requirement that the computer be "mounted to said vehicle," together with the functional descriptor "configured to receive," only further confirms that the claims identify a concrete physical device integrated into the vehicle's architecture. No POSA would interpret the word "computer" as invoking means-plus-function treatment under § 112(f).

**B.    "Said Computer Being Configured to Communicate" (Claims 1, 11)**

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "said computer being configured to communicate" | plain and ordinary meaning<br><br>"computer": plain and ordinary meaning, i.e., an electronic device or component with a data processor<br><br>"configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | means plus function<br><br>• function: communicate with a cell phone<br><br>• structure: none; indefinite<br><br>"configured to": designed/arranged/programmed to; not merely capable of |

78.     The next disputed phrase is "said computer being configured to communicate," which appears in claims 1 and 11 of the '131 patent. Nortrup applies the plain and ordinary meaning: a "computer" is an electronic device or component with a data processor, and "configured to" means designed, arranged, programmed, equipped, or otherwise set up to perform the recited function. Toyota again argues for means-plus-function treatment under § 112(f), contending that the function is "communicate with a cell phone" and that the specification discloses no corresponding structure.

79.     The term "computer" has already been addressed at length above, and in my opinion it clearly denotes a structural, processor-based device that a POSA would immediately recognize. The analysis of "configured to" is likewise already provided; the phrase means that the component is set up—through design, arrangement, programming, or equipping—to perform the recited function without further modification. Those conclusions apply equally here.

80.     In my opinion, the additional functional language—"configured to communicate [with a cell phone]"—further reinforces structural meaning rather than eliminating it. A POSA would understand that for a computer to be "configured to communicate" with a cell phone, the computer must include the hardware interfaces necessary to exchange information with an external device, such as a wired interface (e.g., USB) or wireless interface (e.g., Bluetooth, Wi-Fi, or other radio hardware), along with standard communication protocols and programming needed to send and receive data. Each of these is a physical, structural component or a defined configuration of hardware and software modules, and they are well-known and ubiquitous in automotive computing systems. In 2004–2005, a POSA would have been familiar with in-vehicle computers that communicated with external devices through such interfaces, and would have viewed this language as describing the design characteristics of the claimed in-vehicle computer—not as an empty functional abstraction.

81.     For these reasons, and for the reasons previously discussed with respect to "computer" and "configured to," a POSA would not understand this limitation to invoke § 112(f). The phrase "said computer being configured to communicate" describes a processor-based in-vehicle computer equipped with the necessary communication interfaces to exchange information with a cell phone. It therefore recites sufficient structure and does not fit within the statutory framework for means-plus-function treatment.

**C.      "Said Computer … Configured to Cause … Thereby Causing…" (Claims 1, 11)**

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "said computer … configured to cause … thereby causing…" | plain and ordinary meaning<br><br>"computer": plain and ordinary meaning, i.e., an | means plus function<br><br>• function: to cause said cell phone to transmit a self-determined location of said cell |

| | | |
|---|---|---|
| | electronic device or component with a data processor | phone and a destination signal based on said user input over a cellular network to a networked computer facility; thereby causing said cell phone to receive map data from said networked computer facility over said cellular network, and to cause said map data to be transmitted from said cell phone to said computer such that a map based on said map data is displayed on said display and shows said self-determined location of said cell phone, said route and said traffic conditions along said route |
| | "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | |
| | "cause" / "causing": plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result | • structure: none; indefinite |
| | | "configured to": designed/arranged/programmed to; not merely capable of |

82. This dispute concerns claim language in which the in-vehicle computer is 'configured to cause' a separate cell phone to trigger an ensuing communication sequence. Nortrup applies the plain and ordinary meaning of "computer," "configured to," and "cause/causing." Toyota, by contrast, contends that this language should be treated as a means-plus-function limitation under §112(f), and asserts "structure: none; indefinite." As discussed below, the word "cause" is used here in its ordinary sense—i.e., to bring about or make happen—and, in the context of inter-device communications, that ordinary meaning naturally captures "triggering" another device to perform an action. The claim language also recites a straightforward communication sequence among expressly recited structural components, leaving no basis to invoke §112(f) or to argue indefiniteness.

1.    **"Cause" / "Causing" Has Its Ordinary Meaning: To Bring About or Make Happen (Including by Triggering Another Device).**

83.    In my opinion, a POSA would understand "cause" and "causing" according to their plain and ordinary meaning: to bring about, make happen, initiate, or trigger an effect or result. Standard dictionary definitions confirm this ordinary meaning. For example, Merriam-Webster defines "cause" as "a reason for an action or condition." (*Cause*, MERRIAM-WEBSTER DICTIONARY, Plaintiff_010661.) Collins similarly defines "cause" as "the thing that makes [an event] happen." (*Cause*, COLLINS ENGLISH DICTIONARY, Plaintiff_010677.) And Cambridge defines "cause" as "something without which something else would not happen." (*Cause*, CAMBRIDGE DICTIONARY, Plaintiff_010647.)

84.    A POSA would also understand that, in the context of distributed systems and device communications, "A causes B to do X" commonly means that A issues an instruction, request, signal, or command that triggers B to perform X. That is fully consistent with ordinary English usage: the initiating act (e.g., sending a command/request/signal) "causes" the resulting act (e.g., transmitting data) even though the recipient device is the one that performs the subsequent operation. Thus, when the claim states that the vehicle-mounted computer is "configured to cause said cell phone to transmit" information, a POSA would understand that as describing a computer that is set up to trigger the cell phone to transmit—typically by communicating an instruction/request/signal to the phone that initiates the phone's transmission behavior. Similarly, the phrase "thereby causing" signals an ordinary causal relationship in a multi-step flow: as a result of the phone's transmission to the networked computer facility, the phone receives map data back over the cellular network from the networked computer facility.

### 2.    The Claim Recites a Conventional Inter-Device Request/Response Architecture Among Structural Components, not a §112(f) "Means."

85.    Toyota's §112(f) framing depends on treating this language as if it were an unspecified "means for causing" a result. But the claims do not use "means," and they do not leave the reader guessing about what structures participate in the causal chain. To the contrary, the claim language expressly identifies the relevant components and their roles in the communication flow—namely: (i) "a computer mounted to said vehicle," (ii) "a cell phone … separate from said computer and said vehicle," (iii) a cellular network, and (iv) a networked computer facility. The disputed "configured to cause … thereby causing …" phrase appears within a larger limitation that lays out an if-then/request-response sequence that a POSA would recognize as standard networked-computing behavior: the in-vehicle computer receives destination-related user input, communicates with the phone, triggers the phone to transmit its self-determined location and destination information over the cellular network to a networked computer facility, and—because of that transmission—the phone receives map data back from the networked facility.

86.    Nothing about this reads like an attempt to claim an unexplained functional black box. Each "causing" step corresponds to ordinary interactions between known devices. Moreover, describing one component as "configured to cause" another component to act inherently implies concrete structure and configuration: at a minimum, the in-vehicle computer must have the hardware and programming needed to communicate with the phone (e.g., a wired or wireless interface and supporting protocol/software), and the phone must have the hardware and programming needed to transmit and receive data over the cellular network. A POSA would understand these as routine, well-known structural requirements of inter-device communication, not missing "corresponding structure" that could render the claim indefinite.

32

87. For these reasons—and for the reasons discussed above regarding "computer" and "configured to"—Toyota's position that this language invokes §112(f) and lacks structure is not persuasive. The claim language itself recites the participating structural components and describes a conventional causal chain implemented through ordinary communication links and message-driven control flow. That is the opposite of a §112(f) limitation with "no structure."

### 3. Conclusion

88. In sum, "cause/causing" has its ordinary meaning: to bring about, make happen, initiate, or trigger an effect or result—and in the context of device communications it naturally encompasses triggering another device to perform an action. The claim's use of "configured to cause" therefore captures a vehicle-mounted computer that is set up to send a signal that initiates or triggers a cell phone transmission, followed by the ordinary "thereby causing" consequences in a standard network request/response architecture. At least because the claim expressly recites the structural actors (computer, cell phone, cellular network, networked computer facility) and the communication sequence between them, there is no basis to treat this language as a §112(f) means-plus-function term or to assert indefiniteness for lack of structure.

### D. "Said Cell Phone Interface Being Configured …Thereby Causing…" (Claim 24)

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "said cell phone interface being configured …thereby causing…" ('131 patent, claim 24) | plain and ordinary meaning "cell phone interface": plain and ordinary meaning, i.e., hardware and/or software of a computer, such as ports, transmitters and/or receivers, that allows it to | means plus function • function: to cause said cell phone to transmit a self-determined location of said cell phone, thereby causing said cell phone to receive map data, and to cause said map data to be transmitted from said cell phone to said computer |

33

| | communicate with a cell phone<br><br>"configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function)<br><br>"causing": plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result | • structure: none; indefinite<br><br>"configured to": designed/arranged/programmed to; not merely capable of |
|---|---|---|

89.     This dispute concerns the phrase "said cell phone interface being configured … thereby causing … ," which appears in claim 24 of the '131 patent. Nortrup applies the plain and ordinary meaning: a "cell phone interface" is the hardware and/or software of a computer, such as ports, transmitters, receivers, or other communication components, that allows the computer to communicate with a cell phone; "configured to" means designed, arranged, programmed, equipped, or otherwise set up to perform the recited function; and "causing" means to bring about, make happen, initiate, or trigger an effect or result. Toyota again argues that this limitation should be treated as a means-plus-function term under §112(f), asserting "structure: none; indefinite." As explained below, "cell phone interface" is a structural term with a well-understood meaning to a POSA, and the "configured to" and "causing" language is addressed in my earlier analysis of those terms. For the same reasons previously discussed, this limitation does not invoke §112(f).

### 1.     "Cell Phone Interface" Is a Structural Term Referring to the Hardware/Software by Which the In-Vehicle Computer Communicates with a Phone.

90.     In my opinion, a POSA would readily understand the term "cell phone interface" as referring to the concrete hardware and any associated software that enable communication

34

between the in-vehicle computer and a cell phone. The term "interface" is widely used in engineering to denote a connection point or communication link between two electronic systems or devices. The Cambridge Dictionary defines an "interface" as "a connection between two pieces of electronic equipment . . . ," and gives the example: "My computer has a network interface, which allows me to get to other computers." (*Interface*, CAMBRIDGE DICTIONARY, Plaintiff_011010.) Merriam-Webster likewise defines "interface" as "the place at which independent systems meet and act on or communicate with each other," and as "the means by which interaction or communication is achieved at an interface." (*Interface*, MERRIAM-WEBSTER DICTIONARY, Plaintiff_011024.)

91.     A POSA would apply these definitions in the computing and automotive context and understand a cell phone interface to mean the physical and software-based communication interfaces on the in-vehicle computer that enable it to exchange data with a cell phone. Examples include wired interfaces such as USB ports, and wireless interfaces such as Bluetooth transceivers, Wi-Fi radios, or other short-range communication hardware, along with the protocol stacks and software components that operate those interfaces. In 2004–2005, such hardware was commonplace in vehicles and consumer electronics, and a POSA would recognize a "cell phone interface" as a specific class of structural components, not a generic functional abstraction.

92.     Put differently, the term "cell phone interface" already names the structure that sits between the in-vehicle computer and the phone—a structure that must exist in hardware and software for the claimed communication to occur. Because the term is structural and well understood, nothing about this language suggests a means-plus-function construct. The use of "configured to" and "causing" simply describes what that structural interface is set up to do:

trigger the phone to perform certain communication actions. That is fully addressed in my earlier discussion of those terms.

### 2. This Limitation Does Not Invoke §112(f) Because It Recites Concrete Structural Components and an Ordinary Communication Sequence.

93.     Toyota contends that the phrase beginning with "said cell phone interface being configured to cause…" should be treated as a means-plus-function limitation under §112(f). In my opinion, a POSA would not understand this language to invoke §112(f) for several independent reasons.

94.     First, the limitation expressly recites the structural components involved:

- "a computer having a cell phone interface integrated into said vehicle,"

- "a cell phone being separate from said computer and said vehicle," and

- a communication path over "a cellular network" to "a networked computer facility."

95.     A POSA would immediately recognize these as concrete, known structures in automotive/cellular communication systems. The term "cell phone interface," as explained above, denotes specific hardware and software communication interfaces, such as USB ports, Bluetooth or Wi-Fi radios, transceivers, protocol stacks, and driver software, that physically enable communication between the in-vehicle computer and the phone. Such interfaces are not functional abstractions; they are identifiable hardware modules.

96.     Second, the claim does not merely recite an ultimate functional result, as Toyota frames it. Instead, the claim sets forth a stepwise, causally linked communication sequence among the structural components identified above:

> "said cell phone interface being configured to cause said cell phone
> to transmit a self-determined location of said cell phone and a
> destination signal… over a cellular network to a networked

36

> computer facility; thereby causing said cell phone to receive map data…"

A POSA would recognize this as describing basic, conventional request-response behavior among known devices. The in-vehicle computer, via its interface, triggers the phone to transmit its location and destination information. The phone transmits that data over the cellular network. The networked computer facility responds by sending map data back to the phone. The phone then delivers the map data to the in-vehicle computer for display. Each step in this sequence corresponds to ordinary structural capabilities of the devices, e.g., processors, transceivers, antennas, communication buses, and software, rather than to any unidentified "means."

97.     Third, the phrase "configured to cause" does not eliminate structure or require further structural "corresponding structure" under §112(f). As explained earlier, "configured to cause" simply describes that the interface is set up to trigger the cell phone to perform a defined action. For a POSA, "triggering a transmission by another device" inherently implies concrete structural arrangements: a communication channel between devices, signaling mechanisms, a command or message format, and software that issues the instruction. Those are all well-understood structural components and configurations in 2004–2005 mobile and automotive systems.

98.     Finally, because the claim already identifies the structural components and their interactions with specificity, there is no absence of structure that could support Toyota's assertion of indefiniteness. A POSA would have no difficulty understanding how the claimed interface and devices accomplish the recited behavior. The limitation is implemented through conventional computing and communication hardware, not through an undefined, unclaimed "means."

### 3. Conclusion

99.    In sum, the phrase "said cell phone interface being configured to cause … thereby causing …" recites ordinary interactions among expressly claimed structural components: an in-vehicle computer with a cell phone interface, a separate cell phone, a cellular network, and a networked computer facility. The ordinary meanings of "cell phone interface," "configured to," and "cause/causing" describe a familiar technical arrangement in which the in-vehicle computer, through its communication interface, triggers the cell phone to perform defined transmission steps, which in turn result in the reception and return of map data. A POSA would understand this as a straightforward communication workflow implemented through well-known hardware and software structures. Because the claim itself identifies the devices, their communication channels, and the causal sequence between them, there is no basis to treat this limitation as a means-plus-function term or to assert indefiniteness for lack of structure. The plain and ordinary meaning should therefore apply.

**E.    "A Self-Determined Location of Said Cell Phone" (Claims 1, 11, 24, 29)**

| Claim Term | Nortrup's Proposed Construction | Toyota's Proposed Construction |
|---|---|---|
| "a self-determined location of said cell phone" ('131 patent, claim 1, 11, 24, 29) | plain and ordinary meaning<br><br>"self-determined location": plain and ordinary meaning, i.e., a location determined by the device itself | a current location of a first cell phone, as determined by the first cell phone itself without use of an in-vehicle integrated navigation system |

100.    In my opinion, the phrase "a self-determined location of said cell phone" should be given its plain and ordinary meaning: a location that is determined by the cell phone itself. Nothing in the claim language suggests, and nothing in the intrinsic record requires, the

additional negative limitation Toyota seeks to import—that the cell phone must determine its location "without use of an in-vehicle integrated navigation system." That language does not appear in any claim, and the limitation "self-determined location" simply identifies which device—the cell phone—is responsible for making the final determination of its own location. As discussed in connection with the term "a current location of a first cell phone, as determined by the first cell phone," the fact that the phone must be the device that determines its own location does not imply that the phone is prohibited from receiving location-related inputs or signals originating from the vehicle. The intrinsic evidence contains no clear and unmistakable disclaimer to that effect, and in fact, as explained earlier, the specification and claim set contemplate embodiments in which both the phone and the vehicle may have location capabilities. A POSA would therefore read "self-determined location" to mean exactly what it says—a location that the phone ultimately determines—without inferring any categorical rule that vehicle-originated information is excluded from consideration. For these reasons, Toyota's proposed construction should be rejected, and the plain and ordinary meaning should apply.

## X.     ADDITIONAL EVIDENCE SUPPORTING OPINIONS

In summary of or in addition to the above, the following chart provides intrinsic and extrinsic evidence supporting my opinions:

| Claim Term | Proposed Construction | Intrinsic and Extrinsic Evidence |
|---|---|---|
| "an in-vehicle data receiver forming a part of a vehicle configured to receive…" ('048 patent, claims 1, 13, 15)  "a data receiver configured to receive …" ('048 patent, claim 17) | plain and ordinary meaning  "data receiver": plain and ordinary meaning, i.e., a device or component that receives data or signals, for example in the form of electromagnetic radiation or electrical impulses, from one or more other devices or components  "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | Patent Specification[2]  14:15-20, 16:57-59, 20:16-47, 24:28-32, 32:29-41, 36:40-46, 37:39-55, 39:49-56, Figs. 35, 45 claim 3, claim 4  Extrinsic Evidence  Configure, Cambridge Dictionary (Plaintiff_010833-41)  Configure, Collins English Dictionary (Plaintiff_010842-49)  Configure, Configure, Merriam Webster's Collegiate Dictionary (2004) (TOYOTA_378934-36)  What Is a Receiver?, Analog Devices (TOYOTA_378939)  Receiver, Encyclopedia Britanica (TOYOTA_378938)  Intro to Electrical Engineering Key Term – Receiver, Fiveable (Plaintiff_011266-69) |

---

[2] Unless otherwise specified, specification column and line numbers refer to U.S. Patent No. 11,307,048.

| | | Receiver, Collins English Dictionary (Plaintiff_011296-311) |
|---|---|---|
| "a current location of a first cell phone, as determined by the first cell phone" ('048 patent, claims 1, 17) "a current location" ('048 patent, claim 13, 15) | plain and ordinary meaning "current location": plain and ordinary meaning, i.e., present location | Patent Specification 18:65-19:39, 20:16-47, 37:39-55, Figs. 3, 4, 7, 45 '131 patent, claim 10 File Histories '048 Patent Prosecution, Response to Final Office Action dated Oct. 8, 2021 '131 Patent Prosecution, Supplemental Response to Non-Final Office Action dated Oct. 26, 2023 Extrinsic Evidence Determine, Merriam-Webster Dictionary (Plaintiff_010872-73) |
| "a computer mounted to said vehicle and configured to receive" ('131 patent, claims 1, 11) | plain and ordinary meaning "computer": plain and ordinary meaning, i.e., an electronic device or component with a data processor "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | Patent Specification 33:34-46, 37:39-55, Figs. 41, 45 Extrinsic Evidence Configure, Cambridge Dictionary (Plaintiff_010833-41) Configure, Collins English Dictionary (Plaintiff_010842-49) Configure, Configure, Merriam Webster's Collegiate Dictionary (2004) (TOYOTA_378934-36) |

41

| | | Computer, Britannica, (Plaintiff_010764-84) |
|---|---|---|
| | | Computer, Merriam-Webster Dictionary (Plaintiff_010803-10) |
| | | Computer Basics: What Is a Computer?, GFCGlobal (Plaintiff_010798-802) |
| | | What Is a Receiver?, Analog Devices (TOYOTA_378939) |
| | | Receiver, Encyclopedia Britanica (TOYOTA_378938) |
| | | Intro to Electrical Engineering Key Term – Receiver, Fiveable (Plaintiff_011266-69) |
| | | Receiver, Collins English Dictionary (Plaintiff_011296-311) |
| "said computer being configured to communicate"<br><br>('131 patent, claims 1, 11) | plain and ordinary meaning<br><br>"computer": plain and ordinary meaning, i.e., an electronic device or component with a data processor<br><br>"configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) | Patent Specification<br><br>2:15-42, 2:53-3:6, 4:48-67, 18:65-19:39, 20:16-47, 32:29-41, 37:39-55, Figs. 3, 4, 7, 45<br><br>Extrinsic Evidence<br><br>Configure, Cambridge Dictionary (Plaintiff_010833-41)<br><br>Configure, Collins English Dictionary (Plaintiff_010842-49)<br><br>Configure, Configure, Merriam Webster's Collegiate Dictionary (2004) (TOYOTA_378934-36) |

| | | |
|---|---|---|
| | | Computer, Britannica, (Plaintiff_010764-84) |
| | | Computer, Merriam-Webster Dictionary (Plaintiff_010803-10) |
| | | Computer Basics: What Is a Computer?, GFCGlobal (Plaintiff_010798-802) |
| | | Communicate, Merriam-Webster Dictionary (Plaintiff_010749-57) |
| | | Communicate, Cambridge Dictionary (Plaintiff_010738-48) |
| | | Communicate, Dictionary.com (Plaintiff_010758-63) |
| "said computer … configured to cause … thereby causing …" <br><br> ('131 patent, claims 1, 11) | plain and ordinary meaning <br><br> "computer": plain and ordinary meaning, i.e., an electronic device or component with a data processor <br><br> "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) <br><br> "cause" / "causing": plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result | <u>Patent Specification</u> <br><br> 10:30-41, 14:43-50, 37:39-55, Fig. 45 <br><br> <u>Extrinsic Evidence</u> <br><br> Configure, Cambridge Dictionary (Plaintiff_010833-41) <br><br> Configure, Collins English Dictionary (Plaintiff_010842-49) <br><br> Configure, Configure, Merriam Webster's Collegiate Dictionary (2004) (TOYOTA_378934-36) <br><br> Computer, Britannica, (Plaintiff_010764-84) <br><br> Computer, Merriam-Webster Dictionary (Plaintiff_010803-10) |

| | | Computer Basics: What Is a Computer?, GFCGlobal (Plaintiff_010798-802) |
|---|---|---|
| | | Cause, Cambridge Dictionary (Plaintiff_010644-60) |
| | | Cause, Collins English Dictionary (Plaintiff_010676-94) |
| | | Cause, Merriam Webster Dictionary (Plaintiff_010661-75) |
| "said cell phone interface being configured …thereby causing…" ('131 patent, claim 24) | plain and ordinary meaning "cell phone interface": plain and ordinary meaning, i.e., hardware and/or software of a computer, such as ports, transmitters and/or receivers, that allows it to communicate with a cell phone "configured to": plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) "causing": plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result | <u>Patent Specification</u> 10:30-41, 14:43-50, 32:29-41, 37:39-55, Fig. 40, 45 <u>Extrinsic Evidence</u> Configure, Cambridge Dictionary (Plaintiff_010833-41) Configure, Collins English Dictionary (Plaintiff_010842-49) Configure, Configure, Merriam Webster's Collegiate Dictionary (2004) (TOYOTA_378934-36) Cause, Cambridge Dictionary (Plaintiff_010644-60) Cause, Collins English Dictionary (Plaintiff_010676-94) Cause, Merriam Webster Dictionary (Plaintiff_010661-75) Interface, Cambridge Dictionary (Plaintiff_011010-23) |

| | | Interface, Merriam-Webster Dictionary (Plaintiff_011024-32) |
|---|---|---|
| "a self-determined location of said cell phone"<br><br>('131 patent, claim 1, 11, 24, 29) | plain and ordinary meaning<br><br>"self-determined location": plain and ordinary meaning, i.e., a location determined by the device itself | <u>Patent Specification</u><br><br>18:65-19:39, 20:16-47, 32:29-41, 37:39-55, Figs. 3, 4, 7, 40, 45<br><br>'131 patent, claim 10<br><br><u>File Histories</u><br><br>'048 Patent Prosecution, Response to Final Office Action dated Oct. 8, 2021<br><br>'131 Patent Prosecution, Supplemental Response to Non-Final Office Action dated Oct. 26, 2023<br><br><u>Extrinsic Evidence</u><br><br>Determine, Merriam-Webster Dictionary (Plaintiff_010872-73) |

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of December 2025.

Alexandre Bayen, Ph.D.