# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

**EDWARD NORTRUP,**

 *Nortrup,*

  v.

**TOYOTA MOTOR CORPORATION, et al.,**

 *Toyota*.

Case No. 4:25-cv-00328-SDJ

**JURY TRIAL DEMANDED**

## EXPERT DECLARATION OF DR. MATTHEW B. SHOEMAKE

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ..................................................................................2

II.  EXPERIENCE AND QUALIFICATIONS.........................................3

III.  LEGAL PRINCIPLES.........................................................................8

IV.  THE LEVEL OF ORDINARY SKILL IN THE ART ......................9

V.  OVERVIEW OF THE ASSERTED PATENTS ...............................10

VI.  DISPUTED CLAIM TERMS...........................................................11

    A.  "an in-vehicle data receiver forming a part of a vehicle configured to receive…" ('048 Patent, Claims 1, 13, 15) / "a data receiver configured to receive …" ('048 Patent, Claim 17)............................11

    B.  "a current location of a first cell phone, as determined by the first cell phone" ('048 Patent, Claims 1, 17) / "a current location" ('048 Patent, Claims 13, 15)........................................................................18

    C.  "a computer mounted to said vehicle and configured to receive" / "said computer being configured to communicate" / "said computer … configured to cause … thereby causing…" ('131 Patent, Claims 1, 11) ................................................................................................21

    D.  "said cell phone interface being configured … thereby causing …" ('131 Patent, Claim 24).....................................................................26

    E.  "a self-determined location of said cell phone" ('131 Patent, Claims 1, 11, 24, 29) ........................................................................................27

VII.  CONCLUSION .................................................................................29

VIII.  RIGHT TO SUPPLEMENT..............................................................29

## I.    INTRODUCTION

1.    I, Dr. Matthew B. Shoemake, declare as follows:

2.    Counsel for Defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively, "Toyota") have retained me as an expert in this case.

3.    I understand that Edward Nortrup ("Nortrup") has accused Toyota of infringing certain claims of U.S. Patent Nos. 11,307,048 ("the '048 patent") and 11,874,131 ("'131 patent"). I understand that certain terms of these patents are at issue for claim construction.

4.    I have been asked to provide an opinion on the following terms[1]:

- "an in-vehicle data receiver forming a part of a vehicle configured to receive…" ('048 Patent, Claims 1, 13, 15) / "a data receiver configured to receive …" ('048 Patent, Claim 17)

- "a current location of a first cell phone, as determined by the first cell phone" ('048 Patent, Claims 1, 17) / "a current location" ('048 Patent, Claims 13, 15)

- "a computer mounted to said vehicle and configured to receive" ('131 Patent, Claims 1, 11)

- "said computer being configured to communicate" ('131 Patent, Claims 1, 11)

- "said computer … configured to cause … thereby causing…" ('131 Patent, Claims 1, 11)

- "said cell phone interface being configured … thereby causing …" ('131 Patent, Claim 24)

---

[1] To the extent that the parties are contesting the construction of other claim terms, I have not been asked to offer an opinion on those terms, and I am not opining on those terms.

- "a self-determined location of said cell phone" ('131 Patent, Claims 1, 11, 24, 29)

5.    I have reviewed the patents at issue and their disputed terms, the patents' file histories, and the parties' preliminary claim construction disclosures.

6.    I am being compensated for my services at my standard rate of $805 per hour. My compensation is not contingent upon the particular opinions that I provide, and I have no financial interest in the outcome of this matter. I have no ownership or beneficial interest in any of the parties to this case.

## II.    EXPERIENCE AND QUALIFICATIONS

7.    I have approximately 34 years of experience as an electrical engineer and computer scientist. The asserted patents describe technology relating to locating positions, determining route information, predicting traffic patterns, presenting navigation information, and providing user interfaces for such tasks. I have academic training and professional experience in each of these areas.

8.    I first studied triangulation, trilateration, and GPS systems as an undergraduate at Texas A&M University. At Texas Instruments, I worked on GPS-related issues including preventing interference to GPS receivers in smartphones and using Wi-Fi–based IP-address location information to assist GPS systems in achieving faster position acquisition. My studies at Texas A&M also included relativistic effects relevant to GPS timing accuracy. At both Texas A&M University and Cornell University, I studied electromagnetic theory relevant to the propagation of electromagnetic signals, their time-of-flight characteristics, and methods for measuring propagation delay. I have also served as an expert in multiple matters involving location determination, as reflected in my CV (attached as Ex. A).

9.    I am familiar with graph theory and its application to maps and route selection.

My coursework in the Computer Science Department at Texas A&M included the study of algorithms such as breadth-first search and depth-first search used to find optimal paths in graphs. My research at Cornell further included efficient path-finding algorithms such as the Viterbi and BCJR algorithms, which follow principles similar to those used in computing optimal or constrained paths.

10.    I am familiar with coordinate systems used to represent geographic positions, including latitude-longitude systems. I am also familiar with database technologies used to store and query information such as positions, velocities, directions, and densities of objects. In addition, I have studied path integrals and piecewise approximations that are used to compute quantities over a path, such as travel time given velocity as a function of position or segment.

11.    I have worked on user interfaces since about age 10, when I began programming. Throughout my career, I have designed, developed, or evaluated user interfaces at most of my employers, including interfaces for displaying data, maps, status indicators, and system interactions.

12.    I am familiar with audio and video compression techniques and source coding in general. I have worked with video-compression principles used in standards such as MPEG-2 and H.264, and with audio compression methods. At Cornell University, I served as a teaching assistant for a course in audio processing.

13.    I am familiar with computer interfaces including parallel and serial communication interfaces used to connect components within computing systems.

14.    I am familiar with user interfaces and have worked on such interfaces since at least age 10 when I started programming. I have worked on user interfaces at most if not all of my employers.

15.     I received Bachelor of Science degrees in Electrical Engineering and Computer Science with honors from Texas A&M University, College Station, Texas in 1994. I received a Master of Science degree in Electrical Engineering from Cornell University, Ithaca, New York in 1997. I received a Ph.D. in Electrical Engineering from Cornell University, Ithaca, New York in 1999. My doctoral studies focused on communication and information theory with specific focus on error correction codes. My M.S. thesis and Ph.D. dissertation at Cornell both related to advanced error correction coding, including turbo codes.

16.     From 1991 to 1995, I worked as an intern and engineer in the Digital Signal Processing Group at Texas Instruments, Inc. in Stafford, Texas. I worked on both product engineering and applications engineering projects. Processors that I worked on at Texas Instruments were used in a variety of applications, including, e.g., voice processing, image processing, fax machines, voiceband modems, wireless communications, digital radio receivers, anti-lock brakes on cars and aircraft, and GPS systems. I also worked on user interfaces for DSP evaluation kits while at Texas Instruments.

17.     From 1997 to 2000, I was a manager at Alantro Communications, Inc. in Santa Rosa, California. I managed the baseband systems team where I developed IEEE 802.11b (now Wi-Fi 1) compliant physical layer technology. I also led the first development of IEEE 802.11a (now Wi-Fi 2) OFDM technology at Alantro. Amongst other things, I was responsible for building and designing correlators for packet detection at Alantro, the same type of correlators that are used for detecting signals in GPS systems. Alantro Communications was later acquired by Texas Instruments. The 802.11 solutions that I built at Alantro and Texas Instruments shipped in numerous products, including Intel's Centrino brand of Wi-Fi products and in Dell, D-Link, Linksys, Nokia and many other products. The descendants of those products are still sold by

Texas Instruments today.

18.    From 2000 to 2003, I was the Director of Advanced Technology at Texas Instruments in Dallas, Texas. I worked in the Wireless Networking Business Unit, where I led the numerous efforts including additional of Wi-Fi to mobile phones, enhancement of GPS acquisition time via location estimation based on the public IP address of the Wi-Fi subsystem, Bluetooth and Wi-Fi coexistence technology, quality of service, and Wi-Fi user interfaces.

19.    From 2003 to 2008, I was the CEO and Founder of WiQuest Communications, Inc. in Allen, Texas. I developed the world's first 1 Gbps ultrawideband chipset. I also developed the world's first wireless VGA/DVI system for notebook computers. The technology included video and image compression technology. This technology was incorporated into products developed by several major computer and electronics manufacturers such as Dell, Toshiba, Lenovo, Belkin, D-Link, and Kensington. I built the company from inception to 120 employees. I managed a diverse group of employees that were located in Texas, India, California, Taiwan, and Japan.

20.    In 2008, I founded and became the CEO of Biscotti, Inc. At Biscotti, I developed high-definition, Wi-Fi-based video calling systems for the home and office. During my time at Biscotti, I evaluated numerous Wi-Fi chip offerings for range, rate and robustness capabilities. Wi-Fi products that I evaluated were made by manufacturers such as Broadcom, Atheros (now Qualcomm), Marvell and Texas Instruments. Biscotti products maintained databases of user information including location. Multiple user interfaces were designed including those for customers, operations, and Biscotti apps for iOS and Android. Mapping features were also included to visualize the location of users. Biscotti products used h.264 video compression technology and various audio compression technologies.

21.     Additionally, while at Alantro, Texas Instruments, WiQuest and Biscotti I worked on the movement of video and images over inter-processor, network interfaces including Wi-Fi and USB.

22.     Also, in about 2008, large companies began calling on me to serve as an expert and testifying witness in patent litigation cases. Thus, for about 17 years, I have served in an expert capacity in trials where my expertise in communication systems and standards were relevant. Clients that have used my services include 7- Eleven, Apple, AT&T, Blackberry, Broadcom, Caltech, Canon, Cisco, Dell, FujiFilm, Google, Harmon, Honda, HTC, Intel, Lyft, MediaTek, Mercedes-Benz, Mitsubishi, NXP, Qualcomm, Realtek, Salesforce.com, Samsung, Sharp, Sprint, Subaru, T-Mobile, Texas Instruments, Uber, Verizon, and Wistron.

23.     After working in this capacity as a sole proprietor for many years, I incorporated Peritum LLC in 2015. Today, I continue providing expert engineering, consulting and technical services via Peritum.

24.     I am a named inventor on over thirty patents, including patents related to wireless communications systems and various aspects of data communications systems, including encoding, decoding, and transmission of information.

25.     I have authored, co-authored, and contributed to many academic papers and publications, most in the area of data communications.

26.     I have presented, authored, co-authored and/or co-sponsored many submissions to the IEEE. I have also authored or co-authored numerous papers in IEEE publications, including "High Performance Wireless Ethernet," IEEE Communications Magazine, November 2001, and various other articles in IEEE publications.

27.     I have been a member of the Institute of Electrical and Electronic Engineers

(IEEE) since 1991. In 1999, I was the Chairperson of the IEEE 802.11g (now Wi-Fi 3) Study

Group where I led a committee of twenty engineers to set project requirements for IEEE

802.11g. Subsequently, from 2000 to 2003, I was the Chairperson of the IEEE 802.11g Task

Group where I led a committee of over 200 engineers to set standards for 54 Mbps data rates in

the 2.4 GHz band in a way that was backward compatible with the IEEE 802.11b standard. From

2003 to 2004, I was the Chairperson of the IEEE 802.11n (now Wi-Fi 4) Task Group where I led

a committee of over 300 engineers through the initial stages of standardization of data rate

enhancements in excess of 100 Mbps. The IEEE 802.11n Task Group added features such as

MIMO and compressed feedback of channel matrices to facilitate and optimize performance over

multiple spatial streams.

28.      I served on the External Advisory and Development Committee (EADC) of the

Department of Electrical and Computer Engineering at Texas A&M University starting in 2006.

I served on the EADC for over 15 years, and I hold emeritus status today.

29.      I have worked on products during my career that are based on standards from the

IEEE (e.g. 802.11), ITU (e.g. h.264) , ISO/IEC (e.g. JPEG), Wi-Fi Alliance (e.g. WPA), along

with many others, as well as technologies define by government-issued specifications such as the

U.S. GPS Interface Control Documents (ICDs).

## III.    LEGAL PRINCIPLES

30.      For purposes of this declaration, I have been informed about certain legal

principles relevant to my opinions by counsel for Toyota.

31.      I understand that during "claim construction," the court determines the meaning

of a patent's claims. I understand that the proper construction of a term is how a person of

ordinary skill in the art ("POSITA") would have understood the term at the time of the invention.

I also understand that the terms of a patent claim are generally given their ordinary and customary meaning as understood by a POSITA.

32.    I understand that a patent claim is required to be "definite." I understand that a claim is definite if the terms of the claim inform a POSITA about the scope of the claimed invention with reasonable certainty. Conversely, I understand that if a claim, read in light of the specification and prosecution history, fails to inform a POSITA with reasonable certainty about the scope of the invention, then the claim is indefinite.

33.    Further, I understand that an element in a claim may be expressed as a means for performing a specified function without reciting structure for performing that function. I understand that a claim term expressed in such a way is referred to as a "means-plus-function" claim term. I further understand that, when a claim term is expressed as a means-plus-function, the claim must be construed to cover the corresponding structure described in the specification to carry out the recited function. I understand that for structure described in the specification to be "corresponding structure," it must be it must be clearly linked or associated with the function recited in the claims. I understand that a claim term is indefinite if it is expressed as a means-plus-function and the specification fails to disclose sufficient corresponding structure.

34.    I understand that the absence of the word "means" creates a rebuttable presumption that a term is not a means-plus-function limitation. I understand that a term is nevertheless a means-plus-function claim term if the term fails to recite sufficiently definite structure or recites function without reciting sufficient structure for performing that function.

## IV.    THE LEVEL OF ORDINARY SKILL IN THE ART

35.    A POSITA in the field of the '048 and '131 Patents would have had at least a bachelor's degree in electrical engineering, computer science, computer engineering or a related

discipline, and two years of experience in one or more of the following: telecommunications systems; mobile computing systems; location-based or GPS technologies; software development involving data processing or user-interface design; or navigation, mapping, or path-determination technologies. More formal education may require less experience to attain an ordinary level of skill. Similarly, more experience may serve as a substitute for formal education.

## V.    OVERVIEW OF THE ASSERTED PATENTS

36.    The '048 patent is entitled "Method and System for Providing Travel Time Information." The '048 patent relates generally to a system and method for providing information to travelers using location systems. '048 Patent, Abstract. More specifically, the claimed systems are in general directed to the use of location data from cell phones to generate a traffic-based route that is provided to the vehicle. *See, e.g., id.,* cl. 1. The claims recite an in-vehicle data receiver that receives a map proximate to the self-determined location of a cell phone and a route from said location to a destination. *Id.* The route is based at least in part on roadway traffic conditions, which are estimated based on the locations of other cell phones determined to be moving vehicles. *Id.* The map and route are displayed on an in-vehicle computer display.[2]

37.    Similarly, the '131 patent is entitled "Method and System for Providing Travel Time Information." The '131 patent also relates generally to a system and method for providing information to travelers using location systems. '131 Patent, Abstract. The claims in general recite an in-vehicle computer that receives a user-input destination and communicates with a cell

---

[2] In this paragraph and the following paragraph, I have summarized the language of the claims of the two patents as issue at a high level. I recognize that there are some differences in the wording of the different independent claims. These differences do not affect my opinions and analysis set forth in this declaration.

phone. *See, e.g., id.*, cl. 1. The in-vehicle computer causes the cell phone to transmit its self-determined location and the destination to a networked computer facility over a cellular network. *Id*. The cell phone receives a map, a route from the self-determined location to the destination, and traffic condition information from the networked computer facility. *Id*. The traffic condition information is based on the location information sent from other cell phones to the networked computer facility. *Id*. The in-vehicle computer causes the map, route, and traffic conditions to be displayed on a vehicle-mounted display. *Id*.

## VI.    DISPUTED CLAIM TERMS

### A.    "an in-vehicle data receiver forming a part of a vehicle configured to receive…" ('048 Patent, Claims 1, 13, 15) / "a data receiver configured to receive …" ('048 Patent, Claim 17)

| Toyota's Construction | Nortrup's Construction |
|---|---|
| The overall phrase is subject to Pre-AIA 35 USC 112 ¶6.<br><br>Function: receive a roadway map of an area proximate a current location of a first cell phone, as determined by the first cell phone, and a route from the current location to a destination based, at least in part, on an estimated roadway traffic condition.<br><br>Structure: None; indefinite.<br><br>"configured to" means "designed/arranged/programmed to"; not merely "capable of" | Plain and ordinary meaning.<br><br>"data receiver" – plain and ordinary meaning, i.e., a device or component that receives data or signals, for example in the form of electromagnetic radiation or electrical impulses, from one or more other devices or components<br><br>"configured to" – plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) |

38.    Claims of the '048 patent recite a "data receiver" configured to perform a number of functions. The terms as recited in the claims of the '048 patent would not have connoted sufficiently definite structure to perform the claimed functions to a POSITA at the time of the '048 patent. The "data receiver" limitations refer only to the various functions performed by the "data receiver," and the claims themselves do not disclose any algorithm or other structure

disclosed that corresponds to the "data receiver."

39.    More specifically, the claimed functions are a compound, technical specific function requiring the in-vehicle data receiver forming part of the vehicle to:

- Receive a roadway map of an area around the cell phone's self-determined location;

- Receive a route from the same location to a destination. Here, the route is based at least in part on traffic-condition data estimated from the locations of cell phones.[3]

40.    Thus, the structure must support receiving this type of data. A POSITA would have understood this would require (a) a communication interface; and (b) an algorithm or data-handling process for accepting and processing location-specific mapping and routing information.

41.    A POSITA would have understood "data receiver" to be a generic reference to any hardware, software, or a combination of both that receives data. Thus, any generic "data receiver" could not perform the functions recited in the claims. A POSITA would not have understood the term "data receiver" as referring to any particular structure or class of structures. This is further supported by Nortrup's proposed plain and ordinary meaning of the words "data receiver" being "a device or component that receives data or signals." The '048's claims only provide what functions the "data receiver" is configured to perform. Even the words "data receiver" are merely a reference to the one of the functions the undefined structure is purported to carry out – namely, receiving data. Stated differently, the words "data receiver" convey only that the undefined structure performs the function of receiving data. Thus, at best "data receiver" conveys only the generic ability to receive data, but it does not convey structure for an algorithm

---

[3] As noted above, the claim language is worded slightly differently between the different claims at issue. These differences do not affect my opinions or analysis set forth below with respect to these claim limitations.

or data-handling process for accepting and processing location-specific mapping and routing information, something that is clearly not provided with definite structure by the phrase "data receiver" alone.

42.    I have reviewed the '048 patent's specification in its entirety in an attempt to identify corresponding structure for the "data receiver" at issue. Based on my review, the specification fails to disclose any corresponding structure or algorithm to carry out the recited functions.

43.    The '048's specification provides only a few references to a "receiver" of any kind, and none of these instances provide sufficiently definite structure for carrying out the functions attributed to the "data receiver" recited in the claims. The '048 specification's only references to an in-vehicle data receiver are in connection with Fig. 35.[4] *See* '048 Patent, 16:57-59, 28:35-40. This portion of the specification describes an embodiment different from the claim in which "a vehicle with [a] transmitter" transmits "information relating to its performance" to "a vehicle with a receiver."  The performance information is described as speed, acceleration, deceleration, braking or temperature of the first vehicle. *Id.*, 28:35-43. Neither this nor any other portion of the specification disclose any algorithm or other structure that corresponds to the "data receiver" recited in the claims which corresponds to performing a function of receiving a roadway map and route from a current location to a destination rather than performance information such as speed and acceleration.

44.    Rather than disclosing any algorithm or structure for carrying out the functions recited in the claims, the '048's specification largely comprises additional purported functions

---

[4] There is a single reference to "transponders receivers" as an example of "tollbooth monitors" elsewhere in the '048 patent's specification. This is not related to the data receiver recited in the claims.

that "the methods and systems may involve." For example, the specification provides:

- "The methods and systems may include collecting a plurality of cell phone locations." *Id.*, 5:49-50.

- "In embodiments, the methods and systems may involve estimating the travel time on a road portion through a plurality of cell phone locations." *Id.*, 5:58-60.

- "In embodiments, the methods and systems may involve estimating travel conditions on a travel path through a real time tracking facility; and warning of the travel conditions." *Id.*, 6:13-16.

- "In embodiments, the methods and systems may involve assessing performance of a route over a period of time; predicting future performance of the route based at least in part on the assessed performance; and presenting the predicted performance of the route to a user through a web enabled computing facility." *Id.*, 9:2-7.

The '048 patent's specification is replete with similar functional language. *See, e.g., id.*, 3:47-15:21,

45.    Given that the claimed function requires receiving a "roadway map," I searched the patent specification for discussion of roadway maps. I identified the following, none of which corresponds to receiving a roadway map by an in-vehicle data receiver, as required by the claims:

- "In an embodiment, the locations [of mobile phones, or other ***transmitters***] be used to ***estimate roadway congestion and or travel speed***. For example, cell phones in an area may be located and mapped against a known ***<u>roadway map</u>*** to ***determine roadway congestion levels*** ." *Id.*, 19:54-20:14. This discussion of

"roadway map" does not correspond to the claim function at least because (a) the passage does not discuss receiving of a roadway maps by an "in-vehicle data receiver" at all; and (b) to the degree there is any reception of a map, it is by a "local mapping facility" rather than an "in-vehicle data receiver."

- "The cell phone location may be mapped onto a ***roadway map*** to provide location, speed and other travel information." *Id*., 20:16-40. This passage discussed continued to focus on the "location facility 700" which is separate and distinct from the in-vehicle data receiver. The passage teaches a triangulation system may locate the cell phone and the location may be mapped onto a roadway map. There is no teaching of (a) a roadway map proximate a current location of the cell phone; or (b) reception of a roadway map by an in-vehicle data receiver.

46.    Given the claimed function requires receiving "a route from the current location to a destination based, at least in part, on an estimated roadway traffic condition," I search the patent specification for "current." All locations are discussed here:

- "*route* the user is currently traveling" *Id.*, 8:8-11. This discusses the route being traveled rather than a received route from current location to destination. See also id. at 26:51-53, 27:64-66, 32:

- "*roadway* the user is currently traveling." *Id.*, 8:11-14. This discusses the currently traveled roadway instead of receipt of a route from a current location to destination.

- "route is … based on a typical route followed from the user's current location." *Id.*, 8:14-16. While this does teach basing a route on a current location, it does not teach receiving a route from a current location to a destination "based … on an

estimate roadway traffic condition" nor does it provide structure or an algorithm for receiving a route.

- "predict route performance based on current ... route." *Id.*, 32:24-28. This passage discusses route prediction based on current or past route. It does not pertain to not provide structure for a route from current location to a destination based on traffic conditions. It pertains to the current route rather than current location.

- "current route conditions." *Id.*, 34:20-29. This does not discuss the current location of the cellular phone; rather it discusses current route conditions. There is also no disclosure of an algorithm or structure for determining a route.

- "currently running shows." *Id.*, 34:35-38. The discussion is of sending information to a user about currently running shows, so this had no correspondence to receiving the specific type of route required by the claim.

47.    I also search for "traffic condition." I have found no disclosure discussing "traffic conditions" that discloses an algorithm, procedure or structure for providing a route to an in-vehicle data receiver where the route is "from the current location to a destination [and] based, at least in part, on an estimated roadway traffic condition." The following citations illustrate my findings regarding "traffic conditions."

- Figure 32 discusses a "traffic condition" at step 3204, however, the identified traffic condition results in "*Warning* vehicles in close proximity to the traffic condition through a warning facility" rather than providing a "route" to the in-vehicle data receiver. *See also id.*, 27:25-28:34, 28:64-67.

- At 8:57-65 there is discussion of accessing traffic conditions relative to a route,

but the action is "presenting traffic information to the user through the mobile communication facility" rather than receiving the required route information. There is also no algorithm or structure provided for the claim route.

- At 18:26-31 is discussion of forming routes based on typical as opposed to current traffic conditions. There is no algorithm or structure for how to do this. This discussion is completely functional.

- At 30:31-54 is a discussion of determining alternate route performance based on "initiating a call" as opposed to entering a destination. The users is then provided with "route performance, comparison of times estimates, predicted times, or the like" which may be based on "traffic conditions." Even if this had correspondence to the claimed function, there is no disclosure of associated algorithm or structure.

- At 31:6-9 is discussion of informing the traveler of "traffic conditions" as opposed to providing a route.

- At 32:29-33:9 is discussion of communication between a cell phone, a route information facility, and between the route information facility and an in-vehicle facility. There is no algorithm or structure for how to do this and this discussion relates to a different function.

- At 37:39-55 is discussion relating to an in-vehicle location facility rather than an in-vehicle data receiver. There is no algorithm or structure disclosed in this portion of the specification and this discussion relates to a different function.

48.    The '048 patent does not provide any sufficiently definite structure for carrying out the recited functions. No language in the specification provides an indication of what specific hardware or specific algorithm is contemplated for carrying out the functions of a "data receiver"

that performs the function of "receiv[ing] a roadway map of an area proximate a current location of a first cell phone, as determined by the first cell phone, and a route from the current location to a destination based, at least in part, on an estimated roadway traffic condition."

**B.** **"a current location of a first cell phone, as determined by the first cell phone" ('048 Patent, Claims 1, 17) / "a current location" ('048 Patent, Claims 13, 15)**

| Toyota's Construction | Nortrup's Construction |
|---|---|
| "a current location of a first cell phone, as determined by the first cell phone without use of an in-vehicle integrated navigation system" | Plain and ordinary meaning.<br><br>"current location" – plain and ordinary meaning, i.e., present location.<br><br>"self-determined location" – plain and ordinary meaning, i.e., a location determined by the device itself. |

49.    Claims 1 and 17 of the '048 patent recite "a current location of a first cell phone, as determined by the first cell phone." A POSITA would have understood this term to mean "a current location of a first cell phone, as determined by the first cell phone without use of an in-vehicle integrated navigation system." This understanding would be informed by the customary meaning of the words in the claim term, a POSITA's understanding of the state of the art at the time, and the '048 patent's file history.

50.    The words "as determined by the first cell phone" would convey to a POSITA that the "current location of a first cell phone" is determined by the cell phone alone rather than by or with the help of another device. In particular, a POSITA would have understood this language was intended to distinguish the claimed invention from the many systems that determined a location via an in-vehicle navigation system.

51.    The specification of the '048 patent discloses multiple different mechanisms for determining the location of a cell phone, some performed by the cell phone itself and others

18

performed entirely by external systems. For example, the specification repeatedly discloses triangulation-based location determination, in which a network-based triangulation system or multiple cell towers determine the phone's position by receiving and analyzing transmissions from the phone. *See*, *e.g.*, '048 patent, 8:1-3, 20:28-30 ("The triangulation system may use a plurality of cell phone towers 702 … [that] listen for the cell phone 710 transmission 712."), Fig. 7A. In contrast, other embodiments disclose a cell-phone-determined GPS location, such as location information "provided through a GPS chip in a mobile communication facility." *Id.*, 34:22-23; 46:47-52; 47:53-56. The specification further explains that "a vehicle, cell phone or other device may be equipped with a GPS locating facility," *id*,  20:37-39, confirming that location may be determined by various devices—not necessarily by the cell phone itself. It also teaches that location may be obtained through a "location-based service." *Id.*, 36:54-59. Taken together, the specification conveys to a POSITA that the patent contemplates multiple, alternative sources of location information, several of which do not involve the cell phone determining its own location.

52.    A POSITA would understand that a GPS chip is a hardware module that determines a device's geographic location by receiving satellite signals and performing the necessary calculations—such as time-of-arrival comparisons and trilateration—to compute the device's latitude, longitude, and often elevation. Thus, when the specification states that a vehicle, a cell phone, or another device "may be equipped with a GPS locating facility," a POSITA would understand that the device containing the GPS chip is the entity that determines its own location. A POSITA would understand that a vehicle determining *its* location with its own GPS chip and then communicating that location to a cell phone would not be an example of the cell phone determining its own location, for at least two reasons. First, the location

determination is performed by the vehicle, not by the cell phone or by software or hardware within the cell phone. Second, the resulting position is the location of the vehicle, not the location of the cell phone, and a POSITA would not assume that the two are equivalent unless expressly stated. For these reasons, a POSITA would view "a current location of a first cell phone, as determined by the first cell phone" as requiring that the cell phone itself, through its own GPS chip or internal functionality, perform the location determination.

53.    Further, I have reviewed the file history of the '048 patent (attached hereto as Ex. B), and remarks made by the applicant during prosecution clarify that this is what the term means. During prosecution, claim 1 (original claim 9) was rejected over prior art references US 2004/0204848 ("Matsuo") in view of US 2003/0009277 ("Fan"). Ex. B ("'048 File History") at 256. The examiner explained, among other things, "Matsuo teaches an in-vehicle computer system, comprising an in-vehicle data receiver configured to receive a current location … and a roadway map of an area proximate the current location ...." *Id.* In response, the applicant amended the claim to recite "an in-vehicle data receiver forming a part of a vehicle configured to receive a roadway map of an area proximate a current location of a first cell phone, as determined by the first cell phone." *Id.* at 288 (emphasis added to indicate new language introduce to the claim). The applicant's amendment additionally introduced what would become issued claims 13, 15, 17 (original claims 24, 26, and 28, respectively). *Id.* at 290-291. Applicant remarked that "the claimed inventions recite the use of *a current location of a cell phone, as determined by the cellphone*" because while "[t]he cited art focuses on using an in-vehicle integrated navigation system," "[i]n stark contrast, the present claims are directed to a system that uses a location of *a first cell phone, as determined by the first cell phone* as a basis for receiving the roadway map." *Id.* at 292 (emphasis in original). Applicant goes on to explain that

a "system in accordance with the presently claimed inventions, for example, would operate as intended whether or not the vehicle was equipped with a GPS." *Id.* Accordingly, a POSITA would have understood that the "current location of a first cell phone" is determined without use of an in-vehicle integrated navigation system.

### C. "a computer mounted to said vehicle and configured to receive" / "said computer being configured to communicate" / "said computer … configured to cause … thereby causing…" ('131 Patent, Claims 1, 11)

| Term | Toyota's Construction | Nortrup's Construction |
|---|---|---|
| "a computer mounted to said vehicle and configured to receive" | "configured to" – "designed / arranged / programmed to"; not merely "capable of."<br><br>The overall phrase is subject to Pre-AIA 35 U.S.C. § 112 ¶ 6.<br><br>Function: receive a roadway map of an area proximate a current location of a first cell phone, as determined by the first cell phone, and a route from the current location to a destination based, at least in part, on an estimated roadway traffic condition.<br><br>Structure: None; indefinite. | Plain and ordinary meaning.<br><br>"computer" – plain and ordinary meaning, i.e., an electronic device or component with a data processor<br><br>"configured to" – plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) |
| "said computer being configured to communicate" | "configured to" means "designed/arranged/programmed to"; not merely "capable of"<br><br>Subject to Pre-AIA 35 USC 112 ¶6.<br><br>Function: communicate with a cell phone.<br><br>Structure: None; indefinite. | Plain and ordinary meaning.<br><br>"computer" – plain and ordinary meaning, i.e., an electronic device or component with a data processor<br><br>"configured to" – plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) |
| "said computer … configured to cause … thereby | "configured to" – "designed/arranged/programmed to"; not merely "capable of" | Plain and ordinary meaning.<br><br>"computer" – plain and |

| causing…" | Subject to Pre-AIA 35 USC 112 ¶6.

Function: to cause said cell phone to transmit a self-determined location of said cell phone and a destination signal based on said user input over a cellular network to a networked computer facility; thereby causing said cell phone to receive map data from said networked computer facility over said cellular network, and to cause said map data to be transmitted from said cell phone to said computer such that a map based on said map data is displayed on said display and shows said self-determined location of said cell phone, said route and said traffic conditions along said route.

Structure: None; indefinite. | ordinary meaning, i.e., an electronic device or component with a data processor

"configured to" – plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function)

"cause" / "causing" – plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result |

54.    Claims 1 and 11 of the '131 patent recite "a computer mounted to said vehicle and configured to receive" / "said computer being configured to communicate" / "said computer being configured to cause … thereby causing…"[5] Each has a corresponding function: (1) receiving a roadway map and a traffic-condition-based route associated with the cell phone's self-determined location; (2) communicating with the cell phone; and (3) causing the cell phone to carry out a set of transmissions and receptions-specifically, causing the phone to send its self-determined location and destination to a networked computer facility, causing the phone to receive map data from that facility, and causing the phone to retransmit that map data back to the in-vehicle computer so that a map showing the phone's location, route, and traffic conditions may be displayed.  A POSITA would understand that the term "computer" does not connote

---

[5] As noted above, the claim language is worded slightly differently between the different claims at issue. These differences do not affect my opinions or analysis set forth below with respect to these claim limitations.

sufficiently definite structure for performing the corresponding functions of the claims. Rather, the claims define the "computer" entirely by what it is claimed to do, not by any concrete architecture, circuitry, or algorithm. The '131 patent further fails to disclose any corresponding structure for carrying out these functions.

55.    A POSITA would have understood that the term "computer" is a generic reference to any device capable of processing data, not a term that conveys any specific structural configuration. This understanding is confirmed by, for example the *Merriam-Webster Online Dictionary* which defines a computer as "a programmable usually electronic device that can store, retrieve, and process data." Based on my experience, this general definition has been consistent since at least the 1990s. This extrinsic definition reinforces that "computer" refers broadly to a class of devices capable of executing programmed operations, without implying any particular circuitry, architecture, communication interface, or algorithm. Nortrup's own proposed plain-and-ordinary meaning—"an electronic device or component with a data processor"— likewise confirms the generic nature of the term. The '131 patent's claims add no structural detail beyond stating that the computer is "mounted to said vehicle," which does not impart any definite structure capable of performing the specific receiving, communicating, and causing functions recited in the claims.

56.    I have reviewed the '131 patent's specification in its entirety in an attempt to identify corresponding structure for the "computer" at issue. Based on my review, the specification fails to disclose any corresponding structure or algorithm to carry out the recited functions.

57.    The '131's specification provides only a few explicit references to a "computer," and none of these instances provide sufficiently definite structure or algorithm for carrying out

the functions attributed to the "computer" recited in the claims. Neither these limited references nor any other portion of the specification identifies an algorithm, communication architecture, data-processing structure, or other implementation detail that a POSITA would recognize as corresponding structure for carrying out the recited computer-implemented functions.

58.     With respect to the function of "receiv[ing] a roadway map of an area proximate a current location of a first cell phone, as determined by the first cell phone, and a route from the current location to a destination based, at least in part, on an estimated roadway traffic condition," I incorporate by reference my corresponding analysis for the '048 patent. As explained there, the shared specification discloses no algorithm, circuitry, communication interface, or other structure capable of performing this compound receiving function.

59.     With respect to the function "communicate with a cell phone," it is important to recognize the technological context at the '131 patent's claimed priority date in early 2004. This predates the release of the first iPhone (2007) and coincides with the period just as Nokia introduced the first smartphone with Wi-Fi capability (late 2004). At that time, USB 2.0 was primarily used for connecting personal computers to peripherals such as printers, cameras, and keyboards; in-vehicle USB ports did not begin appearing until approximately 2005–2006. *See*, *e.g.*, *VW Golf Gets USB*, Wired (Sept. 13, 2005), https://www.wired.com/2005/09/vw-golf-gets-us/. Likewise, standardized peer-to-peer wireless communication technologies such as Wi-Fi Direct did not emerge until 2010. *See* Wi-Fi Alliance Press Release (Oct. 25, 2010), https://www.prnewswire.com/news-releases/wi-fi-gets-personal-groundbreaking-wi-fi-direct-launches-today-105666058.html. In this 2004 timeframe, communication between a vehicle-mounted computer and a cell phone was not supported by any well-established standard, and the '131 patent's specification does not recite or refer to any known or standard technology for this

24

communication. A POSITA therefore would have required disclosure of specific structure or an algorithm explaining *how* such communication was to be achieved. The '131 patent, however, provides no such disclosure. Furthermore, the communication with the cell phone is in connection with performing specific functions which, as discussed below, are not disclosed in the specification.

60.    With respect to the function requiring the in-vehicle computer "to cause said cell phone to transmit a self-determined location of said cell phone and a destination signal based on said user input over a cellular network to a networked computer facility; thereby causing said cell phone to receive map data from said networked computer facility over said cellular network, and to cause said map data to be transmitted from said cell phone to said computer such that a map based on said map data is displayed on said display and shows said self-determined location of said cell phone, said route and said traffic conditions along said route," the '131 patent discloses **no structure or algorithm whatsoever** for performing this multi-step causal control operation. A POSITA would expect the specification to describe the communication protocols, control logic, signaling sequences, or processing steps necessary to effectuate such behavior— particularly because, at the 2004 priority date, communication between a vehicle-mounted computer and a cell phone was supported by any standardized mechanism. The shared specification, however, contains **no description of how the in-vehicle computer is programmed or arranged to cause the phone to transmit data, receive data, or retransmit that data back to the vehicle**, nor does it disclose any algorithm that would enable a POSITA to implement these required operations. As a result, there is **no corresponding structure** for this claimed function.

61.    Like the '048 patent, rather than disclosing any algorithm or structure for carrying

out the functions recited in the claims, the '131's specification largely comprises additional purported *functions* that "the methods and systems may involve." Being that the '048 and '131 share the same specification, the '131 is replete with the functional language like that described above. *See supra* ¶44.

### D.    "said cell phone interface being configured … thereby causing …" ('131 Patent, Claim 24)

| Toyota's Construction | Nortrup's Construction |
| --- | --- |
| Subject to Pre-AIA 35 USC 112 ¶6.<br><br>Function: to cause said cell phone to transmit a self-determined location of said cell phone, thereby causing said cell phone to receive map data, and to cause said map data to be transmitted from said cell phone to said computer.<br><br>Structure: None; indefinite.<br><br>"configured to" – "designed / arranged / programmed to"; not merely "capable of" | Plain and ordinary meaning.<br><br>"cause" / "causing" – plain and ordinary meaning, i.e., to bring about, make happen, initiate, or trigger an effect or result<br><br>"cell phone interface" – plain and ordinary meaning, i.e., hardware and/or software of a computer, such as ports, transmitters and/or receivers, that allows it to communicate with a cell phone<br><br>"configured to" – plain and ordinary meaning, i.e., designed, arranged, programmed, equipped, or otherwise set up to perform (a stated function) |

62.    Claim 24 of the '131 patent recites "said cell phone interface being configured … thereby causing …" A "cell phone interface" does not connote sufficiently definite structure to a POSITA and is defined solely by the functions it is purported to perform. Further, the '131 patent's specification does not disclose corresponding structure for carrying out the recited functions.

63.    A POSITA would have understood that a "cell phone interface" is a generic reference to any hard, software, or combination of both, enabling interaction with a cell phone. This is further supported by Nortrup's proposed plain-and-ordinary meaning for "cell phone interface" being "hardware and/or software" that allows something to "communicate with a cell

phone." The '131's claims do not provide any sufficiently definite structure or algorithm for carrying out the recited functions, nor would a POSITA have understood "cell phone interface" to refer to any particular structure or class of structures.

64.    I have reviewed the '131 patent's specification in an attempt to identify corresponding structure for the "computer" at issue. Based on my review, the specification fails to disclose any corresponding structure or algorithm to carry out the recited functions.

65.    The '131 patent's specification does not provide any structure or algorithm to carry out the recited functions, and instead only provides additional functional language as previously mentioned. *See supra* ¶44. While the 131's specification makes multiple references to a "user interface," *e.g.* '131 Patent, 2:29-32, 5:23-26, 5:40-47, 13:41-46, such as the one recited in claim 24 "for receiving user input," the specification makes nearly no mention of a cell phone interface. In fact, the specification only provides that a "route information facility user interface" may be a "cell phone interface." *Id.*, 2:31-34. This single reference does not convey any definite structure or algorithm for carrying out the functions recited in the claims, nor does any other portion of the '131 specification.

66.    Like the '048 patent, rather than disclosing any algorithm or structure for carrying out the functions recited in the claims, the '131's specification largely comprises additional purported functions that "the methods and systems may involve." Being that the '048 and '131 share the same specification, the '131 is replete with the functional language like that described above. *See supra* ¶44.

**E.    "a self-determined location of said cell phone" ('131 Patent, Claims 1, 11, 24, 29)**

| Toyota's Construction | Nortrup's Construction |
|---|---|
| "a current location of a first cell phone, as determined by the first cell phone without use | Plain and ordinary meaning. |

| of an in-vehicle integrated navigation system" | "self-determined location" – plain and ordinary meaning, i.e., a location determined by the device itself |
|---|---|

67.    The claims of the '131 patent recite "a self-determined location of said cell phone." Like the similar term recited in the '048 patent, a POSITA would have understood this term to refer to the current location of the cell phone, as determined by the cell phone, without the use of an in-vehicle integrated navigation system. My explanations provided in connection to the similar disputed term of the '048 are similarly applicable to this disputed term. *See supra* ¶¶49-53.

68.    The words "self-determined" would convey to a POSITA that the "location of said cell phone" is determined by the cell phone alone rather than by or with the help of another device. As previously explained, a POSITA would have understood this language was intended to distinguish the claimed invention from systems that determined a location (a) by triangulation performed by cell towers; or (b) location determined by an in-vehicle navigation system, among other possibilities. *See supra* ¶¶50-53.

69.    Nortrup's proposed plain and ordinary meaning further supports that the "self-determined location of said cell phone" is done without the use of an in-vehicle navigation system as the cell phone's location is "determined by the device itself" as opposed to with the assistance of any other device.

70.    This understanding is further supported by in the intrinsic record, including by the file history of the '048 patent. The '131 patent's application is the grandchild of the '048 patent's application (App. No. 16/600,480). Ex. C ("'131 File History") at 101. The substantive portions of the '131 patent's specification are identical to that of the '048 patent. As detailed above, the applicant explained that the claimed invention was distinct and "[i]n stark contrast" from the prior art because "[t]he cited art focuses on using an in-vehicle integrated navigation system" for

the "determination of a current position of the vehicle." '048 File History at 292 (emphasis in original). *See supra* ¶53. During prosecution of the '131, the applicant further emphasized that "the in-vehicle computer system causes a ***discrete*** cell phone to transmit a self-determined location of the said cell phone." '131 File History at 369 (emphasis in original). Thus, the cell phone is an entirely separate and distinct device that determines its own location without use of any other device, particularly an in-vehicle integrated navigation system.

## VII.    CONCLUSION

71.    For the foregoing reasons, it is my opinion that Toyota's proposed constructions of the disputed terms discussed above are correct.

## VIII.    RIGHT TO SUPPLEMENT

72.    I reserve the right to supplement my opinions in the future, including to respond to arguments raised by Nortrup, and to take into account new information that may become available to me.

73.    I declare that all statements made in this declaration are based on my own knowledge and experience and are true to the best of my knowledge and that any statements made on information and belief are thought to be true.

Dated: December 15, 2025

Dr. Matthew B. Shoemake